**Nedra BAGLEY and Janice Derr, Plaintiffs,**

**v.**

**R.J. WATSON, Assistant Director, Department of Human Resources, Administrator of Corrections; G.E. Sullivan, Superintendent, Oregon State Correctional Institution; Hoyt C. Cupp, Superintendent, Oregon State Penitentiary; and Department of Human Resources, Corrections Division, State of Oregon; Defendants.**

Civ. No. 80–573FR.

United States District Court, D. Oregon.

July 4, 1983.

J. Bradford Shiley, Portland, Or., Alice L. Dale, Or. Public Employes Union, Salem, Or., for plaintiffs.

Dave Frohnmayer, Atty. Gen., William F. Hoelscher, Asst. Atty. Gen., Salem, Or., for defendants.

## OPINION AND ORDER

FRYE, District Judge:

Defendant State of Oregon has moved for a partial summary judgment asking the court to rule on two limited issues: (1) whether male prisoners in the state correctional institutions have state and/or federal constitutional rights to freedom from clothed "pat-down" frisk searches, and/or visual observations in states of undress, by female Correctional Officer Guards, and if so, (2) whether such constitutional rights constitute a bona fide occupational qualification (BFOQ) within the meaning of Title VII of the Civil Rights Act of 1964, which would permit the state to employ "males only" in a certain number of guard positions having duties which cannot be accommodated to exclude "pat-down" frisk searches and visual observation of prisoners in states of undress.

All of the parties agree that after the court has enunciated the extent of the male prisoners' constitutional rights and the standing of those rights as BFOQ under Title VII, that settlement negotiations can resolve most of the remaining disputes.

The parties have filed a "Stipulation of Fact;" the defendants have submitted the Affidavit of Dr. Lois Shawver; and both parties have asked the court to assume that there are certain guard positions which cannot be accommodated to exclude female correctional officer guards from performing "pat-down" frisk searches and visual observation of male prisoners in states of undress.

## STIPULATION OF FACT

1. The State of Oregon maintains an all male maximum security correctional institution at the Oregon State Penitentiary, an all male minimum security correctional institution at the Oregon State Correctional Institution and an all female correctional institution at the Women's Correctional Center.

2. Each correctional institution employs both male and female guard employes classified as "Correctional Counselors."

3. Each correctional institution has identified each guard position as either "male only" or "either sex" depending on the regularly assigned duties of the individual position. While plaintiff and defendant are in dispute as to whether *all* "male only" positions can or cannot be accommodated to permit the regular duties of the positions by employes of "either sex," it is agreed that *some* "male only" positions regularly require the employes in these positions to perform clothed "pat-down" or frisk searches of the anal-genital area of male prisoners and to observe such male prisoners in states of undress while using showers and toilet facilities.

4. In the case of *Sterling v. Cupp*, 44 Or.[App.] 755, 607 P.2d 206 (1980), the Oregon Supreme Court confirmed in part a Circuit Court injunction forbidding the defendants from permitting female guard employes from regularly making "pat-down" or frisk searches of the anal-genital area of male prisoners.

5. Defendants have not employed female persons in positions designated as "male only."

6. The affidavit of Dr. Lois Shawver is submitted by the parties to address the issue of inmate privacy and the effect of female guards working in all male penal institutions. The parties agree the doctor would so testify if called.

A portion of the Affidavit of Dr. Shawver is incorporated in this opinion as follows:

Through my experience dealing with inmates, it is my belief that women counter the development of brutish and violent prisons. When women are not present, the pecking order of the prison-

ers tends to be a simple function of the ability of one prisoner to intimidate and subjugate another. Women can introduce a new and softening element in the construction of this pecking order. When women are present, the most admired prisoner is often the one whom others perceive to be the most respected by women. In a prison which includes women staff, prisoners will often boast of a woman officer's, or a woman staff person's, attention. Similarly, male prisoners will often admonish each other to behave more gentlemanly, and women often report that they can reduce violent encounters by gentler means than are effective by male correctional officers. In this regard, it is noteworthy that in the decade or so that women have worked in male prisons, we have learned that the suppressed sexuality of the prisoners does not manifest itself with the attempt to rape and subjugate the women staff. There are generally, in fact, less assaults on women than there are on men (cf. Holeman and Krepps-Hess). When sexual assaults do occur, they are almost always in the form of pinching and touching, pale shadows of the sexual aggressions some male prisoners force on other male prisoners. It was once feared that the presence of women would excite untempered passions in the prisoners, but the social experiment has now been conducted and it is clear that, if anything, women reduce the violent tensions in male prisons rather than contribute to them.

On the more obvious side, my clinical experience and review of available studies has caused me to believe that women clearly contribute to the normality of the prison. Prisoners are often people who have great difficulty dealing with women, especially when they do not have an intimate relationship with that woman. Their rehabilitation will not, therefore, be fostered by our creating artificial environments without women. To do this, is merely to ignore the problem during the time of incarceration. The period of incarceration would be a time for men to learn to relate to women in a nonaggressive and non-intimate way. Such a capacity could only serve to enhance their chances for a successful parole adjustment.

My clinical experience and review of the available surveys also indicate that only a minority of men in prison report that they feel women in the housing units either invades their privacy or otherwise makes them feel uncomfortable....

\* \* \* \* \* \*

... To say that the majority of prisoners are comfortable with women in the housing units does not imply that it is impossible to imagine situations in which female officers would pose a threat to the majority of prisoners. It might possibly be that the men who report feeling comfortable have learned methods of protecting their modesty (i.e., by timing their use of the toilet or by taking a towel to the shower). One female officer I talked with who has worked many years in the housing units of male prisons informed me that she has never seen a prisoner naked, that it has always been possible for prisoners to protect their modesty.

In summary, the majority of men in male prisons seem relatively comfortable with women in their housing units. We can assume this is true because the majority of men find they are not that easily embarrassed by the presence of women because the women who are present conduct themselves professionally to protect men's sense of dignity, or because the men have acquired methods of preserving their modesty, or for some combination of these factors.

It is my professional opinion that a persons' (sic) need for privacy around issues of nudity and excretion is a rather direct function of one's personal modesty regarding these issues. The person who is outraged at "invasions of privacy" (regarding nudity and excretion) is universalizing his personal modesty, for unless a community is generally modest in this way, the "right to privacy" is an overglorified and useless concept. One cannot imagine a nudist colony, or a group

of naked aborigines, getting very excited about their "right to privacy" regarding nudity.

\* \* \* \* \* \*

As a society, we have established a minimum level of protected modesty. We are offended, for example, if surveillance procedures in department stores plant secret cameras in their dressing rooms. And we are offended when voyeurs peek in windows. But the need to protect ourselves in this way is based on a recognition of some people's desire to look. Modesty is self-consciousness in the fact (sic) of real or imagined interest on the part of others in looking.

And so it is that many people lose their self-consciousness when they become convinced other people are not very interested in looking. Embarrassed modesty can subside in the presence of a person, for example, a nurse or a doctor, who evidences no personal interest in looking. Perhaps this is why a recent study (Holland, et al., 1979), indicated that male felons preferred female nurses over male nurses. When one learns that certain people are capable of seeing you without being fascinated or personally interested in seeing you, one's self-consciousness, or modesty fades. I think the process works both ways. When people like nurses learn that their patients are not self-conscious, they lose the style of looking that makes their patients self-conscious. Self-consciousness is a contagious state of affairs.

\* \* \* \* \* \*

According to Kissel and Siedel, the majority of men who claim that having women in the housing units constitutes an invasion of their privacy are, upon closer inspection of their complaints, merely complaining about the inconvenience caused by having to maintain their privacy, largely, as they see it, for the needs of the women officers. Such men might enjoy lounging in their underwear and the women officers create some hindrance to that. It is my belief that it is misleading to label concern with this inconvenience a concern with women "invading privacy."

In spite of the fact that most prisoners are not bothered by women in the housing units, and that many of those who are bothered are actually bothered by the inconvenience of maintaining privacy rather than by an unavoidable invasion of their privacy, there appears to be at least a handful of prisoners who are genuinely distressed by the presence of women. In my judgment, many of these men, if not all of them, suffer from neurotic conflicts surrounding nudity and bodily functions. As such, they can be so concerned with modesty that they plead for single cells on the grounds that they cannot urinate nor defecate in the presence of others, regardless of gender.

\* \* \* \* \* \*

## ALLEGATIONS OF THE COMPLAINT

Plaintiffs Nedra Bagley and Janice Derr are females employed by the Department of Human Resources, Corrections Division, an agency of the State of Oregon, as corrections officers, whose terms and conditions of employment are controlled by the defendants.

Plaintiffs allege that since September 27, 1978, the defendants have designated approximately 90% of certain positions for corrections officers at Oregon's penal institutions as "male only." Because of this designation, plaintiffs are unable to gain experience in approximately 90% of the corrections officer positions within the institutions where they are employed. Plaintiffs allege that designating these positions as "male only" limits the amount of overtime available to them and limits the advancement and promotional opportunities they have. As a result, plaintiffs earn less money and occupy lesser positions than they would have in the absence of the discriminatory practices of defendants.

## DISCUSSION AND CONCLUSIONS

*Issue 1:* Do male prisoners in the Oregon correctional institutions have state and/or federal constitutional rights to freedom from clothed "pat-down" frisk searches, and/or visual observations in states of undress, by female Correctional Officer Guards.

### Oregon Constitutional Rights

■ The Oregon Supreme Court held in *Sterling v. Cupp*, 290 Or. 611, 625 P.2d 123 (1981), that male inmates are protected by Article I, Section 13 of the Oregon Constitution from having "pat-down" or "frisk" searches or other searches of their anal-genital areas conducted by female guards except when necessity requires it. The court held that these kinds of searches if conducted routinely by females upon males violates the male inmates' state constitutional rights not to be treated with "unnecessary rigor." [1]

### United States Constitutional Rights

■ Defendants do not contend that the clothed "pat-down" frisk searches of inmates anal-genital areas or the visual observations of inmates in states of undress are unreasonable and therefore unconstitutional under the Fourth Amendment to the United States Constitution, nor could they. In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Court held that visual body cavity searches [2] which are necessary not only to discover but also to deter the smuggling of weapons, drugs, and other contraband into the institution are reasonable searches and therefore do not violate the Fourth Amendment rights retained both by convicted prisoners and pretrial detainees. If body cavity searches are constitutional, then clothed "pat-down" frisk searches and the visual observation of inmates in states of undress are also reasonable and therefore constitutional.

■ The only issue here is whether a reasonable and therefore constitutional search of a male inmate becomes unreason-

able and therefore unconstitutional if it is performed by a woman.[3] Clearly it does not. Male prisoners in the Oregon correctional institutions have no federal constitutional rights to freedom from clothed "pat-down" frisk searches and/or visual observations in states of undress performed by female correctional officer guards.

*Issue 2:* Does the Oregon constitutional right of male inmates not to be treated with unnecessary rigor constitute a bona fide occupational qualification (BFOQ) within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(e)(1)

The Supreme Court of Oregon in *Sterling v. Cupp, supra,* did not address the female guards' equal employment opportunity rights. In his opinion Justice Hans Linde wrote:

> In the present case, the claim for relief before the trial court and this court is that of prisoners, not of corrections officers.... [T]he officers' employment rights are a separate issue.

290 Or. at 628, 625 P.2d 123.

This court must first determine whether the right of male prisoners not to be treated with unnecessary rigor under the Oregon Constitution constitutes a BFOQ exception under Title VII. If it does, then defendants will prevail. If it does not, then this court must decide whether the female corrections officers' rights under Title VII supersede the male inmates' rights under the Oregon Constitution.

### Title VII

Section 703(a) of Title VII, 42 U.S.C. § 2000e–2(a), provides:

> (a) It shall be an unlawful practice for an employer—

---

1. There is no such constitutional guarantee under the Federal Constitution.

2. "If the inmate is a male, he must lift his genitals and bend over to spread his buttocks for visual inspection. The vaginal and anal cavities of female inmates also are visually inspected. The inmate is not touched by security personal (sic) at any time during the *visual* search procedure." *Bell v. Wolfish, supra,* at 558, n. 39, 99 S.Ct. at 1884, n. 39. (Emphasis in original).

3. Defendants argue that the male inmates have privacy rights that transform constitutional searches into unconstitutional ones when performed by women. The United States Constitution does not expressly provide for a right of privacy; the United States Supreme Court has not judicially created a constitutional right of privacy such as defendants advocate; this court declines to do so.

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ...; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... sex ...

However, section 703(e) of Title VII, 42 U.S.C. § 2000e–2(e)(1), allows sex-based discrimination "in those certain instances where ... sex ... is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." Defendants contend that "male only" positions are BFOQ exceptions to Title VII.

The "bona fide occupational qualification" exception to the clear mandate of Title VII is an extremely narrow exception. *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). However, an employer could rely on the BFOQ exception by proving that he or she had reasonable cause to believe, on a *factual* basis, that all or substantially all women or all men would be unable to perform safely and efficiently the duties of the job involved, or that the very *essence* of the business operation would be undermined by not hiring members of one sex exclusively. *Harriss v. Pan American World Airways, Inc.*, 649 F.2d 670, 676 (9th Cir.1980). It is impermissible, however, to refuse to hire an individual woman or man on the basis of stereotyped characterizations of the sexes or because of the preferences of co-workers, the employer, clients, or customers. 29 C.F.R. § 1604.2.

The facts before this court do not indicate that the legitimate functions of the Oregon correctional institutions will be undermined by allowing women to perform clothed "pat-down" frisk searches and/or visual observations of male inmates. There is no showing that women will be unable to safely and efficiently perform these jobs.[4] The facts presented to this court show that women guards have a wholesome effect on male prisons in general, and that most male inmates feel comfortable with women guards in their housing units; that only a minority of male inmates suffer an invasion of their perceived personal privacy interests by the presence of female guards, and that for the most part, male inmates' privacy interests can be protected by adjustment of their own habits.

Obviously, male inmates cannot adjust their habits so as to prevent routine clothed "pat-down" frisk searches by female corrections officers, and to prevent all visual observation of male inmates in various stages of undress. This may be experienced as an affront to their privacy by some inmates, as the Oregon Supreme Court recognized in raising this particular privacy concern to the level of a constitutional right by calling it "unnecessary rigor." However, this court agrees with Justice Marshall, who in his dissent in *Dothard v. Rawlinson*, 433 U.S. at 346, n. 5, 97 S.Ct. at 2735, n. 5, said:

[I]f women guards behave in a professional manner at all times, they will engender reciprocal respect from inmates, who will recognize that their privacy is being invaded no more than if a woman doctor examines them. The suggestion implicit in the privacy argument that such behavior is unlikely on either side is an insult to the professionalism of guards and the dignity of inmates.

"Pat-down" frisk searches and/or visual observations of male inmates in various states of undress by male *or* female correctional officers may well offend most, if not all inmates. But such searches and such viewing are justified by the prison's need for security, and whether it is performed by males or females is not demonstrably

---

**4.** The proper response to improprieties on the part of either male inmates or female correctional officers is not to limit the employment opportunities of all of the female correctional officers, but to take swift and sure punitive action against the male inmate offenders and to terminate the employment of the female correctional officer offenders.

more significant. *In re Montgomery,* Superior Court of the State of California for the County of San Luis Obispo (Sept. 19, 1978).

■ One of the goals of prison administration must be to respect as far as possible privacy concerns of the inmates. However, the preference of some male inmates for male guards, and the indignity perceived by some male inmates as a result of having women guards perform the kinds of searches and observations at issue in this case, even though deserving of some deference by our societal standards and even though granted constitutional protection by the Oregon Supreme Court, do not justify discrimination against women in employment so as to constitute a BFOQ exception to the nondiscriminatory mandate of Title VII.[5]

The court must now decide whether the female corrections officers' rights under Title VII supersede the male inmates' rights under the Oregon constitution.

The supremacy clause of the United States Constitution (U.S. Const. Art. VI, Cl. 2) has been held to mean that a state may not "retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress ..." *McCulloch v. Maryland,* 4 Wheat 316, 436, 4 L.Ed.2d 579 (1819); *Kleppe v. New Mexico,* 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976), *rehearing denied* 429 U.S. 873, 97 S.Ct. 189, 50 L.Ed.2d 154; *Case v. Bowles* 327 U.S. 92, 66 S.Ct. 438, 90 L.Ed. 552 (1946).

The reasoning behind the supremacy clause is as follows:

Since the United States is a government of delegated powers, none of which may be exercised throughout the Nation by any one state, it is necessary for uniformity that the laws of the United States be dominant over those of any state. Such dominancy is required also to avoid a breakdown of administration through possible conflicts arising from inconsistent requirements. The su-

premacy clause of the Constitution states this essential principle. Article VI. A corollary to this principle is that the activities of the Federal Government are free from regulation by any state. No other adjustment of competing enactments or legal principles is possible. *Mayo v. United States,* 319 U.S. 441, 445, 63 S.Ct. 1137, 1139, 87 L.Ed. 1504 (1943).

■ The female officers' federal rights to equal employment opportunities under Title VII supersede the male inmates' rights to be free from unnecessary rigor under the Oregon constitution.

IT IS ORDERED that defendant State of Oregon's motion for partial summary judgment is DENIED.

---

5. This opinion applies only to male inmates and female guards. The issue of searches of female inmates by male guards is not before this court.

This court has no facts before it relating to searches of female inmates by male guards.