**Robert MICHENFELDER, Plaintiff,**

v.

**George SUMNER, et al., Defendants.**

**No. CV–R–84–279–ECR.**

United States District Court,
D. Nevada.

Dec. 26, 1985.

458

Robert Michenfelder, in pro per.

Brian McKay, Atty. Gen. by: David F. Sarnowski, Deputy, Carson City, Nev., for defendants.

## ORDER

EDWARD C. REED, Jr., District Judge.

This civil rights action was commenced by Plaintiff, an inmate of the Nevada State Prison, by the filing of a complaint on July 5, 1984. He complained of repeatedly being strip searched on the tier outside of his cell where female correctional officers and other inmates could observe him naked. He also complained of being threatened with a taser gun if he didn't cooperate as to the strip searches. The strip search procedure is degrading and dehumanizing, according to Plaintiff, whereas the use of a taser gun is too forceful a means to employ against an inmate, such as himself, who is merely resisting peacefully a degrading strip search. The prayer of the complaint requests a declaratory judgment establishing that the defendants' conduct is violative of Plaintiff's constitutional rights. Injunctive relief also is prayed for prohibiting the defendants from: (1) strip searching Plaintiff when he can be observed by female correctional officers and the other inmates; (2) using a taser gun at any time; and (3) searching Plaintiff at all when he is on his way to sick call, recreation or classification, or under escort anywhere in Unit Seven,

where he is housed. Compensatory and punitive damages also are demanded.

A separate motion for a preliminary injunction was filed at the same time. In it, Plaintiff contended that the strip search procedure and the threatened use of a taser gun caused psychological distress. By minute order dated August 27, 1984, U.S. Magistrate Phyllis Halsey Atkins, to whom the case had been referred, consolidated the hearing of the motion for a preliminary injunction with the trial of the action, and advanced the trial date to October 3, 1984. Plaintiff objected to the consolidation, asserting that the safety of taser guns is a matter for experts. He claimed that an extended discovery period would be needed to obtain technical information concerning taser guns. In addition, time would be needed to consult with an expert on such guns and have him appointed by the Court to testify for Plaintiff, who is proceeding *pro se in forma pauperis*. This Court affirmed the Magistrate's consolidation ruling by order filed September 19, 1984, in which it was explained that the Magistrate's ruling was neither clearly erroneous nor contrary to law.

Trial commenced October 3, 1984. It then was continued until October 24, 1984, when it was completed. Magistrate Atkins filed her Report and Recommendation on March 29, 1985. She noted that Unit Seven is the most secure housing in the Prison, which is a maximum security facility. The forty inmates whose cells are in Unit Seven are considered the most dangerous and escape-prone in the Nevada prison system. An inmate must go through a classification process before being assigned to the Unit. Unless the inmate has caused trouble in prison or is an escape risk, he is not housed in Unit Seven. Conversely, a Unit Seven inmate may be reclassified to less secure housing after a classification procedure.

The Magistrate found that the strip search policy has the objective of preventing the Unit Seven inmates from obtaining or possessing contraband that could be used to injure correctional officers or other inmates. She held that the policy is not an

exaggerated response to a legitimate security interest. Further, Magistrate Atkins felt that proper deference should be given the expertise and informed discretion of the prison authorities in such matters. She found no violation of Plaintiff's Fourteenth Amendment rights by reason of his being strip searched routinely, no matter where he is going or coming from.

As to the searches being conducted outside Plaintiff's cell, the Magistrate found that a correctional officer is placed at a dangerous disadvantage when he must search an inmate in the latter's cell. Thus, the outside searches are reasonably related to the governmental interest in security within the Prison. Further, she found that there is not available any more private site for searches that would not present unreasonable security risks.

The Magistrate found that the use of female correctional officers where they occasionally can observe Plaintiff in the nude is a good faith attempt to comply with the law requiring that equal prison employment opportunities be afforded women. She emphasized that female correctional officers may not actually conduct strip searches of male prisoners except in case of emergency. The Magistrate concluded that the Prison policy is a reasonable accommodation of the inmates' right to privacy and the female correctional officers' right to equal employment opportunity.

The Report of Magistrate Atkins acknowledged that an inmate disabled by a taser gun could be injured if he fell against something pointed or hard. However, she noted that the inmates who have been subjected to hits from taser guns reported only slight headaches and some nausea after the immediate pain from the taser darts had ceased. Other than "sustained long-term anger," no psychological effects appear to have been suffered by the targets of the taser guns. Further, the Magistrate commented that the use of fists or clubs by correctional officers, as an alternative to taser guns, would result in confrontations where someone likely would be hurt. Stun guns were labeled ineffective, because the

inmate can shield himself from the bean bag that is expelled by such a gun. The disadvantages of tear gas as an alternative were considered obvious. Magistrate Atkins held that the use of taser guns is a reasonable method of ensuring compliance with the strip search policy, so that the use on an inmate does not constitute cruel and unusual punishment in an Eighth Amendment sense.

In conclusion, the Magistrate summarized that the Prison policies do not violate Plaintiff's constitutional rights. Nor did Plaintiff introduce any evidence that would support a damages award, she indicated. Magistrate Atkins recommended that Plaintiff's motion for a preliminary injunction be denied and that judgment be entered in favor of the defendants and against Plaintiff.

Timely objections to the Magistrate's Report and Recommendation have been filed by Plaintiff. He contends that strip searches can, and in this case do, invade personal rights protected by the Constitution. This is especially so because Unit Seven prisoners are transported or escorted while handcuffed and manacled. Plaintiff urges that the strip search policy is unreasonable in that light. He also reargues the feasibility of conducting strip searches in the cells, rather than out on the tier. Testimony was given that in-cell searches have been, and still are, conducted in the Prison without any violence. In addition, Plaintiff contends that female correctional officers could be employed in the Prison without being assigned to posts where they routinely may observe male prisoners in the nude.

Plaintiff has renewed his objection to the Magistrate's consolidation of the hearing on his motion for a preliminary injunction with the trial itself. He insists that a psychiatrist would have helped him prove that strip searches leave long-lasting psychological effects on inmates.

In objecting to the Magistrate's Report re the use of taser guns, Plaintiff emphasizes that he and other prisoners are willing to be strip searched in their own cells.

It is the humiliation they incur before the eyes of others, when searched out on the tier, about which he complains. Less drastic alternatives than the use of taser guns should be used to overcome peaceful resistance, he insists. Damages should be awarded him for being threatened unnecessarily with a taser gun, in Plaintiff's estimation.

The defendants have filed a response to Plaintiff's objections. In it they emphasize how regularly Unit Seven inmates have been found in possession of deadly weapons and have attacked others. They conclude that the Unit Seven strip search procedures are reasonably designed to thwart such illegal and dangerous conduct. The defendants further point out that Plaintiff made no serious attempt to obtain a psychiatrist as an expert witness until some eleven months after the filing of the complaint. This is in answer to his objections to the consolidation of the preliminary injunction hearing with the trial. Also, they argue that no psychiatrist's testimony could change the fact that the safety of correctional officers would be jeopardized by any alternatives to the existing strip search and taser gun policies exercised in Unit Seven.

*Consolidation*

The propriety of Magistrate Atkins' consolidation of the hearing on Plaintiff's motion for a preliminary injunction with the trial of the action already has been considered by this Court. There is nothing in the Magistrate's Report and Recommendation that could serve as a basis for Plaintiff's renewed objection to the consolidation. Objection is permitted only to specific portions of the Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b).

 Nevertheless, the Court has reconsidered the matter because it involves the fundamental fairness of the consolidated hearing and trial. Where such consolidation is ordered, sufficient notice is required to permit the parties to develop their cases fully. *Wohlfahrt v. Memorial Medical Center*, 658 F.2d 416, 418 (5th Cir.1981). "Although each case will de-

pend on its own circumstances, the ten-day notice requirement of Rule 56 for summary judgment motions might be taken as suggestive of the minimum amount of time necessary to permit a litigant to prepare a showing upon which the final outcome of the case may depend." 11 Wright & Miller, Fed.Prac. and Proc. (1973) § 2950, at p. 488. Certainly ten days would be insufficient where, as here, an *in forma pauperis* prisoner would have to locate an expert witness, obtain court appointment of that witness, and consult with him. However, more than seven weeks had elapsed between the filing of the complaint and the order of consolidation herein, and there is no indication that Plaintiff acted at all in this regard during that time. Also, there was a five-week interval between the order and the date set therein for commencement of trial, and Plaintiff didn't make any effort during that time. Further, an additional three weeks passed between the first day of trial and the second (and last) day, and Plaintiff did nothing to avail himself of an expert witness. It wasn't until June 18, 1985, some seven months after the close of the trial, that Plaintiff first indicated that he had contacted a psychiatry expert who had indicated a willingness to discuss the case with him. Under such circumstances, Plaintiff's renewed objection to the consolidation must be overruled.

*Routine Strip Searches*

 Plaintiff objects to being subjected to strip searches when he is on his way to sick call, recreation or classification, as well as when he is proceeding under escort anywhere within Unit Seven. It is clear that strip searches are not per se unconstitutional. *Bagley v. Watson*, 579 F.Supp. 1099, 1103 (D.Or.1983). Nor are prison officials required to employ the least restrictive means available when responding to a legitimate security concern. *Block v. Rutherford*, 468 U.S. 576, 104 S.Ct. 3227, 3233–34, 82 L.Ed.2d 438 (1984). Keeping contraband away from Unit Seven prisoners is, without doubt, a critical prerequisite to preserving internal order and maintain-

ing institutional security. Strip searches are reasonably related to these objectives, therefore judicial inquiry into their propriety should end. *Id.* 104 S.Ct. at 3232 and 3234. It was Plaintiff's burden to show that the defendant Prison officials intentionally used exaggerated or excessive means to provide the needed security. *Soto v. Dickey,* 744 F.2d 1260, 1271 (7th Cir.1984); *Bell v. Wolfish,* 441 U.S. 520, 561–62, 99 S.Ct. 1861, 1885–86, 60 L.Ed.2d 447 (1979). Where, as here, there is an absence of substantial evidence in the record to indicate that the Prison officials have overreacted in their response to security considerations, a court should defer to their expert judgment. *Block v. Rutherford, supra* 104 S.Ct. at 3232; *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977).

*Female Correctional Officers' Observation of Strip Searches*

■ Prisoners do not enjoy the same right of privacy as do ordinary citizens. *Robbins v. South,* 595 F.Supp. 785, 790 (D.Mont.1984). Such a right would be incompatible with the close and continual surveillance required to ensure institutional security and internal order. *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 3201, 82 L.Ed.2d 393 (1984). In addition, the prisoner's reduced right of privacy must give way to the right of women to equal job opportunities in the prison setting. *Bagley v. Watson, supra* at 579 F.Supp. 1104–05; *Robbins v. South, supra* at 790. A prohibition against female correctional officers being assigned to posts where they may view naked male prisoners not only would lessen the chance for women to be hired for prison work, but also would dampen their chances for advancement if they were hired. The evidence in this case indicates a proper sensitivity to this delicate matter on the part of the defendants.

*Conducting Strip Searches Outside of Cell*

■ The physical layout of Unit Seven is such that there is no place close to the cells where strip searches can be conducted in a more secluded setting. If an inmate, such as Plaintiff, had a constitutional right not to be strip searched where other persons might observe, then the nonavailability of a more private place would not excuse or justify the present practice of conducting the searches on the tiers. However, there is no such constitutional right. The evidence is convincing that the correctional officers' safety would be jeopardized if they were to be forced to enter a cell in order to search the prisoner within. Only prisoners who already have caused trouble or tried to escape are assigned to the Unit. Even walking them to a place where they might enjoy more privacy while being searched would entail unacceptable risk. It would be naive to believe that one or more of the prisoners wouldn't figure out a way to abuse such a practice. *See Hudson v. Palmer, supra* 104 S.Ct. at 3201.

■ Although there is no constitutional right protecting a prisoner from being subjected to a strip search, a state may create a constitutionally protected liberty interest by promulgating a prison regulation that imposes substantive limitations on the exercise of official discretion. *Baumann v. Arizona Dept. of Corrections,* 754 F.2d 841, 844 (9th Cir.1985). In order for a protected interest to be created, the regulation must provide objective and defined criteria that the officials are required to respect. *Id.* Nevada Department of Prisons Administrative Regulation No. 422 covers search procedure. It authorizes strip searches as a routine requirement for inmate movement into and out of high security areas. The Regulation states that routine searches may be conducted as a preventative measure. There is nothing there that would create a constitutionally protected interest against strip searching on the tiers of Unit Seven.

The Magistrate correctly noted that visitors looking into the control booth from outside are unable to see the tier television monitors clearly because of an opaque plas-

tic on the windows of the booth. Only movement can be discerned on the monitors from outside the booth. Since strip searches per se are permissible, the opportunity of female correctional officers to observe the searches does not violate the inmates' constitutional rights, and any outside visitors cannot see clear images on the monitors, what is left to resolve is the constitutionality of the strip searches being conducted where the other inmates housed in the tier can observe them. There are ten cells on each tier, so that a maximum of nine other male inmates could view a search of Plaintiff. This situation is no more offensive than the usual nudity found in a locker room in a school or YMCA.

*Use of Taser Guns*

Plaintiff has objected to any use of a taser gun on an inmate. What precipitated the objection was its threatened use against him if he refused to step out of his cell in order to be strip searched on the tier.

 The Eighth Amendment's proscription against the infliction of cruel and unusual punishments prohibits the wanton and unnecessary infliction of pain on a prisoner. *Spain v. Procunier*, 600 F.2d 189, 196 (9th Cir.1979); *Albers v. Whitley*, 743 F.2d 1372, 1375 (9th Cir.1984), *app. pdg. Albers* teaches that an actual intent to punish is not required. Any unjustified striking or infliction of bodily harm by or with the authorization of state officials may be sufficient to violate the Eighth Amendment. *Id.* at 1374. The evidence indicates that the taser darts draw blood and cause pain when they hit the target person. Therefore, the question is whether the infliction is justified for the purpose of getting a prisoner out of his cell in order to be strip searched. The Ninth Circuit has declared that a proper standard deems the Amendment to have been violated when the force used is so unreasonable or excessive as to be clearly disproportionate to the need reasonably perceived by prison officials at the time. *Id.* at 1375. This requires that a prisoner's Eighth Amendment claim be proved by conduct more egregious

than that adequate to support a common law tort, such as battery. *Williams v. Mussomelli*, 722 F.2d 1130, 1133 (3rd Cir. 1983). Federal courts may not interfere with decisions made by state prison officials, absent a constitutional violation. *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir.1982). The Civil Rights Act, e.g., 42 U.S.C. § 1983, imposes liability for violation of rights protected by the Constitution, not for violation of duties arising out of tort law. *King v. Blankenship*, 636 F.2d 70, 73 (4th Cir.1980).

 Where the defendants' conduct, although harsh, cannot be said to have been cruel and unusual under contemporary standards, it was not unconstitutional. *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981); *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984). A court's judgment as to what the contemporary standards are should look to objective indicia of what the general public would consider decent. *Toussaint v. McCarthy*, 597 F.Supp. 1388, 1392 (N.D. Cal.1984). Such indicia include expert opinions and professional standards. *Id.* at n. 3. The record before the Court indicates that a taser gun causes involuntary muscle contractions, with resulting loss of balance by the target. The guns were first used (on animals) in 1968, so that they have been in use long enough for any severe side effects or after effects to have manifested themselves. Nevertheless, neither side has cited any case involving the use of a taser gun on a human being. The Court's own research did not uncover such a case either. However, Nevada Department of Prisons Administrative Regulation No. 405(V)(B)(4)(a) states: "When situations arise, such as an inmate who refuses to leave his cell, in which physical handling is inadequate and in which the use of batons would be inappropriate, the use of taser or stun guns may be employed." Prison regulations are promulgated by the Board of State Prison Commissioners, pursuant to authority granted in NRS 209.111(3). It

seems safe to assume that the Board received input from persons with experience and expertise before prescribing the Regulation. As discussed above, physical handling or the use of batons would require the correctional officers to enter the prisoner's cell and use physical force on him there. Someone very likely would be hurt. The use of a taser gun on a prisoner who refuses to leave his cell under the circumstances of this case, therefore, is authorized by Nevada law. The Court notes that verbal warnings were given the prisoner in each instance that a taser gun would be used on him if he continued to refuse to obey the order to step out of his cell for a strip search. This is considered to have some significance. *See Spain v. Procunier, supra* at 600 F.2d 189; *Albers v. Whitley, supra* at 743 F.2d 1376; *Soto v. Dickey, supra* at 744 F.2d 1270. In *Spain,* the Ninth Circuit upheld the use of tear gas in small amounts as a necessary prison technique if a prisoner, after warning, refuses to move from his cell. 600 F.2d at 195. Where tear gas is used, other prisoners in the vicinity often incur discomfort even though they did nothing to provoke its use. The Seventh Circuit has held that the use of mace on a prisoner who had refused to obey a direct order was a reasonable response to a legitimate security concern. *Soto v. Dickey, supra* at 1271. The Court agrees with Magistrate Atkins that the use and threatened use of taser guns, under the circumstances as established by the evidence in this case, did not violate Plaintiff's Eighth Amendment rights.

*Conclusion*

After reviewing the entire record, the Court accepts in whole the recommendations of Magistrate Atkins.

IT IS, THEREFORE, HEREBY ORDERED that Plaintiff's motions for preliminary injunctive relief be denied.

IT IS FURTHER ORDERED that judgment be entered in favor of the defendants and against Plaintiff.