[Crim. No. 30197. Second Dist., Div. One. June 13, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
DOUGLAS REED HEFFNER, Defendant and Appellant.

COUNSEL

Weinstein, Shelley & Proctor and Robert R. Shelley for Defendant and Appellant.

John K. Van de Kamp, District Attorney, Harry B. Sondheim and George M. Palmer, Deputy District Attorneys, for Plaintiff and Respondent.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, and William R. Pounders, Deputy Attorney General, as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

**LILLIE, Acting P. J.**—Following certification by the appellate department of the superior court, and good cause appearing therefor, the within appeal was transferred from the municipal court to this court for determination of whether Penal Code section 12031, subdivision (a)[1] applies to the weapon known as a "Taser."

Defendant's vehicle was stopped by police for investigation of a Vehicle Code violation; as defendant exited the vehicle, the officer observed a Taser in a holster on his belt, determined that it was "loaded" and arrested him. Defendant was convicted in the municipal court of violating section 12031, subdivision (a). The appellate department of the superior court (Judge Alarcon dissenting) reversed the judgment.

Whether section 12031, subdivision (a) applies to a Taser depends on whether the Taser is construed as a "firearm" within the meaning of the statute, and, if it is, whether it can be construed to be a "loaded firearm" as defined by section 12031, subdivision (e), Penal Code.

---

[1] "(a) Except as provided in subdivision (b), every person who carries a loaded firearm on his person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory is guilty of a misdemeanor."

The exceptions in subdivision (b) are inapplicable to the instant case. Nor does the recent amendment of the statute (Stats. 1976, ch. 1426, § 4) have any bearing.

The Taser involved herein is a model TF-1. As described by defendant, the Taser is a handheld, flashlight configured plastic weapon which contains an electrical supply unit and into which expendable plastic cassettes are inserted. The cassettes contain insulated wires attached to barbed contactors. The contactors are deployed (up to a distance of 15 feet) by the electrical ignition of a squib containing four-fifths of a grain of smokeless powder. Upon deployment on the target area, a pulsed low-amperage current is carried to the barbed contactors via the insulated wires. The current passes into the body of the target and will temporarily incapacitate him. To supplement this description, each of the two chambers of the instrument into which a cassette is inserted and from which the contactors are expelled has a square muzzle and is longer in depth than in height or width; in other words, each chamber has the shape of a rectangular parallelepipedon or elongated cube. Each cassette is of the same configuration as each chamber and fits snugly into it. The Taser is a recent innovation in weaponry and has been the subject of some controversy; it has elicited comment from a number of public officials regarding its legal status.[2]

### *Is the Taser a "firearm" for purposes of section 12031, subdivision (a)?*

The statute fails to define the term "firearm." However, Penal Code section 12001 defines concealable firearms and it may, with reason, be inferred that if the Taser is a firearm at all it is a concealable firearm, like a pistol or revolver, and unlike a rifle or shotgun. That being so, for the Taser to be a firearm within legislative contemplation it must satisfy the definition of section 12001, which reads in relevant part: " 'Pistol,' 'revolver,' and 'firearm capable of being concealed upon the person' as used in this chapter shall apply to and include any device, designed to be used as a weapon, from which is expelled a projectile by the force of any explosion, or other form of combustion, and which has a barrel less than 12 inches in length." Reduced to checklist form, a concealable firearm must be a device (1) designed to be used as a weapon, (2) which expels a projectile, (3) by the force of any explosion or other combustion, and (4) having a barrel less than 12 inches in length.

There is and can be no real dispute that the Taser is designed to be used as a weapon, and that the Taser's barbed contactors are expelled by

---

[2]See Ferretti, Zap, New York Times Magazine (Jan. 4, 1976) pages 13-16 which refers to action taken by officials in California, New Jersey, and New York City.

the force of explosion. Defendant has suggested that the Taser's contactors do not qualify as projectiles. He asserts that "A projectile, in firearm nomenclature, is an object which can penetrate or pass through the body of the person it strikes," and that this is not true of the Taser's barbed contactors. Even if defendant is correct in claiming that "projectile" is often used as a term of art, it is apparent that the Taser's barbed contactors literally satisfy the definition he proffers inasmuch as the barbs of the contactors are designed to and do penetrate the skin and clothing of the target. Admittedly, the penetrating power and the depth of penetration of the barbs are comparatively slight, being limited to what is necessary for electrical contact. However, unless "penetrate" is also to be given a restricted meaning, it is apparent that the barbs of the Taser's contactors can and do penetrate the body of the target. More generally, though, we see no reason to believe that the Legislature used the term "projectile" in any technical sense. ■ Ordinarily, in construing a statute words are to be given their common meaning. ■ The common meaning of "projectile" as "A body projected by exterior force, and continuing in motion by its own inertia; specif.,: a missile for a firearm or cannon"[3] is quite appropriate in the context of section 12001. It has the advantage the technical usage claimed by defendant does not, of including projectiles capable of inflicting significant damage but without the potential for real penetration, for example, rubber bullets.[4]

■ The most serious point of controversy with respect to application of the section 12001 definition of a concealable firearm is whether the Taser has a barrel less than 12 inches in length. The only parts of the Taser which lend themselves to description as "barrels" are the chambers into which the barbed contactors are placed and from which they are expelled; if they are barrels they are certainly less than 12 inches in length.[5]

---

[3] All dictionary definitions herein are taken from Webster's New International Dictionary of the English Language (2d ed. 1937) unabridged, G. & C. Merriam Company, Publisher. A number of dictionaries have been referred to by the parties and the superior court, and we note some variation in definition among the various sources.

[4] Defendant does not argue and we do not believe that the contactors cannot be projectiles because they remain attached to the handheld device, via the insulated wires, following their firing.

[5] In an amicus curiae brief filed in support of a petition for rehearing before the superior court, the Attorney General argued that the phrase "Which has a barrel less than 12 inches in length" in section 12001 would include a device having no barrel—"Zero is less than 12 inches." We do not consider this matter.

Asked what "barrel" means as applied to a weapon, the average person would likely advance the functional definition suggested by the People, namely that the barrel is that part of a gun/firearm which controls the direction of the projectile fired therefrom. True, the barrel of a gun typically is made of metal and is usually cylindrical in shape. Yet there appears no reason logically or semantically to insist that a gun's barrel must be made of metal or that it be cylindrical. We do not understand defendant to argue that because the Taser is not made of metal it can have no barrel, yet he does argue that because the Taser's chambers are not cylindrical they cannot be barrels. The configuration of the barrel, however, depends largely on the shape of the projectile designed for use with the weapon. It is common knowledge that firearms with other than a cylindrical barrel have been devised. It is hardly reasonable to suppose that in adopting the Dangerous Weapons' Control Law, the Legislature intended to be wedded to a hypertechnical definition of "barrel," one placing without the law a pistol with, say, an octagonal barrel. If that were so, the purpose of the law would be readily frustrated. ■ As was observed in *People* v. *Deibert*, 117 Cal.App.2d 410, 418 [256 P.2d 355] in a somewhat different context, "The complexities of the social problems dealt with by the Legislature require that a practical construction be given to the language employed by the draftsmen of legislation lest their purposes be too easily nullified by overrefined inquiries into the meaning of words."

■ If the dictionary is to be consulted as the arbiter of usage, "barrel," as relevant here, is defined as "The metal *tube* of a gun, from which the projectile is discharged" (italics added), while "tube" is defined as "1.a. A hollow cylinder, of any material, to convey liquids or gases or for some other purpose; . . . b. Any similar hollow conduit, often oval, square, or polygonal in section." Thus, while it is true that "barrel" often denotes something of cylindrical shape, whether it does or not depends on the context in which it is used. We have no qualms about concluding that the Taser's cartridge chambers are "barrels" within the ordinary meaning of the term, and consequently that the Taser is a firearm within section 12031, subdivision (a).

*Can the Taser be a "loaded firearm" as*
*defined by section 12031, subdivision (e)?*

The subdivision states: "A firearm shall be deemed to be loaded for the purposes of this section when there is an unexpended cartridge or shell, consisting of a case which holds a charge of powder and a bullet or

shot, in, or attached in any manner to, the firearm, including, but not limited to, in the firing chamber, magazine, or clip thereof attached to the firearm; except that a muzzleloader firearm shall be deemed to be loaded when it is capped or primed and has a powder charge and ball or shot in the barrel or cyclinder."

We should have thought that, as a matter of logic, any device qualifying as a firearm can also qualify as a loaded firearm. Defendant, however, thinks otherwise. He argues that, whether or not the Taser is a firearm, it cannot be a loaded firearm within section 12031 because there is nothing in the Taser which resembles a "bullet" or "shot," required by the definition of "loaded" in subdivision (e).

We note, initially, that the apparent purpose of subdivision (e) is to make it clear that for purpose of section 12031 the usual meaning of "loaded firearm" is to apply. This is inferable from the fact that, as part of the same legislative package containing section 12031 (Stats. 1967, ch. 960, § 1, p. 2459), the Legislature enacted Penal Code sections 171c, 171d, and 171e. (Stats. 1967, ch. 960, §§ 2, 3, 4, pp. 2461-2462.) The former two sections generally prohibit the bringing or possession of loaded firearms in certain state governmental offices and the residences of certain state officers and legislators. For purposes of *these* sections a firearm is deemed loaded "whenever both the firearm and unexpended ammunition capable of being discharged from such firearm are in the *immediate possession of the same person.* (§ 171e, italics added.) Obviously "loaded" as so defined is somewhat at variance with the ordinary understanding of what constitutes a loaded weapon. For a different problem—carrying a loaded weapon in less sensitive places—it seems that this definition was deemed inappropriate. The definition of "loaded" applied to this situation comports with common usage; unlike section 171e, it does not include a situation in which a person has both a firearm and ammunition in his possession but the latter is not "attached to" the firearm. In common usage there is no doubt that the Taser, upon insertion of the barbed contactors into the chambers from which they are expelled, is indeed loaded. "The loading of a gun simply affects the condition of the weapon by making it immediately useful for firing." (*People* v. *Delong,* 11 Cal.App.3d 786, 792 [90 Cal.Rptr. 193].)

Testing ordinary usage against the dictionary definitions of what defendant considers the critical terms of subdivision (e), we pass directly to the term "shot" in the phrase "unexpended cartridge or shell, consisting of a case which holds a charge of powder and a bullet or shot."

"Shot" is defined as "2.a. Orig., A missile or projectile, as an arrow or stone . . .; now, a projectile designed to be discharged from a firearm or cannon, by the force of an explosion." Having already concluded that the Taser's barbed contactors are projectiles and that the Taser is a firearm, the conclusion that the contactors fall within the definition of "shot" is ineluctable. Undoubtedly "shot" as a noun is often used to mean small lead pellets used in a single charge, as in buckshot or birdshot. Its more general sense, however, is "that which is discharged in shooting" without special concern as to whether the item is metal or plastic, round or square.

Lexicographers are not generally the authors of our laws. If they were, perhaps blind reference to dictionary definitions of a statute's terms would adequately substitute for the process of judicial interpretation. As it is, however, dictionaries can only aid in the determination of the Legislature's intent in the enactment of a law. The Legislature is aware of the Taser, but the single express legislative reference thereto explains only that the Taser is not to be considered "any firearm which is not immediately recognizable as a firearm" under section 12020. (Stats. 1976, ch. 1140, § 5.) From this reference it is uncertain whether the Legislature intended (1) to exempt the Taser from regulation as not a firearm at all, or (2) to make it clear that the Taser falls under the heading of an ordinary firearm thus should not be subject to the more stringent provisions of section 12020. We think it unlikely that the former is true. As already observed, the Taser is readily includable in the definition of "firearm," and to our knowledge it has been consistently so included by officials called upon to decide the question.[6] Moreover, the legislative concern for the safety of the people of this state endangered by the carrying of loaded firearms by either their use or violent incidents arising from the presence of armed individuals in public places (Stats. 1967, ch. 960, § 6, pp. 2462-2463), would seem to embrace the carrying of a Taser. While its potential for inflicting injury *may* be less than that of a typical firearm, its strangeness might well enhance its potential for provocation. Furthermore, while in 1967 section 12001 was amended in a manner which made it clear that, contrary to the recommendation of the Assembly Interim Committee on Criminal Procedure, it does not include $CO_2$ pistols, an expansive definition of concealable firearms was retained. The definition is expansive in the sense that it goes beyond

---

[6]Department of the Treasury. Bureau of Alcohol, Tobacco, and Firearms (rule 76-6 (1976) [under 18 U.S.C. § 921 (a)(3)(A)]; 58 Ops. Cal.Atty.Gen. 777 (1975) [under Cal.Pen.Code. § 12001]; New York Times (Oct. 29, 1975), page 27, column 3 [under New York Sullivan Law].)

"pistol" and "revolver" which would have included all handguns, and adds "firearms capable of being concealed upon the person" which includes atypical concealable firearms. One such atypical firearm, a sawed-off shotgun, had already been the subject of legislation (§ 12020), and if concealable firearms were to be limited to such firearms as those with which the Legislature was familiar viz., pistols, revolvers, and sawed-off shotguns, the Legislature likely would have so said.[7] Instead of simply naming the firearms it had in mind, the Legislature described the *kind* of firearms with which it was concerned.

To summarize, we conclude that a Taser is a firearm and can be a loaded firearm within section 12031. In other words, the question presented for determination, whether section 12031, subdivision (a) applies to the weapon known as a "Taser" is answered in the affirmative.

■ We have deferred to this point consideration of defendant's position that his conviction can be sustained only by an expansive reading of the critical terms of the statute in question, that this is contrary to the policy that a penal statute be construed as favorably as possible to the defendant "as its language and the circumstances of its application may reasonably permit; . . . the defendant is entitled to the benefit of every reasonable doubt as to the true interpretation of words or the construction of language used in a statute." (*Keeler* v. *Superior Court*, 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].)

How does the reasonable doubt, the benefit of which defendant seeks, arise? Surely it does not arise in the average person's contemplation of section 12031 as applied to the Taser. Once the nature and capabilities of the weapon have been explained there can be little hesitation before concluding that it is indeed a firearm as normally understood and, when ready for firing, is a loaded firearm. Rather, the supposed doubt arises solely from the novelty of the Taser.

Novelty, of course, is the way of an active world. Exposed to a novel object one can make no judgment as to what category in which it is to be placed until one learns its nature and function. Given this understanding of the Taser, an obvious descriptive term is "weapon." Choice of even this obvious category involves some judgment, but it is easy to decide

---

[7] We recognize that only those sawed-off shotguns having barrels less than 12 inches in length would qualify under section 12001.

that the Taser is a weapon and not, say, a toy. Asked for a subcategory of weapons in which to place the Taser, another easy choice is made—*it is a shooting weapon*, not a cutting or clubbing weapon. As an interrogator asks for further refinements in the classification the decisions become more difficult; the difficulty is compounded when the available classifications are given detailed definitions. So with a Taser one may progressively describe it as a weapon, a shooting weapon, a gun (not a slingshot or bow and arrow), and so on to firearm. At each step the hesitation preceding the announcement of one's conclusion may increase. And it is this hesitation, this period of analysis which defendant would characterize as doubt. But this is not doubt. So to say would be to substitute "doubt" for "evaluation" or "analysis." It is a conclusion of which one doubts, not the process of reaching a conclusion. The conclusion that the Taser is a firearm only follows careful consideration, but it is a conclusion, once reached, about which there is no reasonable doubt.[8]

One final question remains for consideration and that is whether section 12031, subdivision (a) comports with due process in giving notice that the carrying of a Taser armed for firing falls within the proscription of carrying a loaded firearm. ■ The rule is stated: "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law. [Citations.]" (*Connally* v. *General Const. Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126].)

With respect to this question little need be added to our previous discussion. ■ A statute is not unduly vague because its terms may be so dissected as to yield some ambiguity or uncertainty. Any word may be so prodded and teased that its otherwise clear meaning may become murky. That is not to say, however, that the words fail to satisfy the due process notice requirement. Indeed the United States Supreme Court has recently repudiated just such an approach. In *United States* v. *Powell* (1975) 423 U.S. 87 [46 L.Ed.2d 228, 96 S.Ct. 316], it was held that the phrase "firearms capable of being concealed on the person" in 18 United

---

[8]Compare *Callanan* v. *United States* (1961) 364 U.S. 587, 596 [5 L.Ed.2d 312, 318-319, 81 S.Ct. 321] (fn. omitted): "Petitioner invokes the 'rule of lenity' for decision in this case. But that 'rule,' as is true of any guide to statutory construction, only serves as an aid for resolving an ambiguity; it is not to be used to beget one. . . . The rule comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers. That is not the function of the judiciary."

States Code, section 1715 proscribing the mailing of such firearms is not unconstitutionally vague. Defendant in that case had been convicted of violating the section for mailing a sawed-off shotgun with an overall length of 22⅛ inches. The court said, of the challenged statute: "It intelligibly forbids a definite course of conduct: the mailing of concealable firearms. While doubts as to the applicability of the language in marginal fact situations may be conceived, we think the statute gave respondent adequate warning that her mailing of a 22-inch-long sawed-off shotgun was a criminal offense. Even as to more doubtful cases than that of respondent, we have said that 'the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree.' (*Nash* v. *United States*, 229 U.S. 373, 377 (1913). [¶] The Court of Appeals questioned whether the 'person' referred to in the statute to measure capability of concealment was to be 'the person mailing the firearm, the person receiving the firearm, or, perhaps, an average person, male or female, wearing whatever garb might be reasonably appropriate, whatever the place and whatever the season.' (501 F.2d, at 1137.) But we think it fair to attribute to Congress the commonsense meaning that such a person would be an average person garbed in a manner to aid, rather than hinder, concealment of the weapons. Such straining to inject doubt as to the meaning of words where no doubt would be felt by the normal reader is not required by the 'void for vagueness' doctrine, and we will not indulge in it." (423 U.S., at p. 93 [46 L.Ed.2d at p. 234].)

■ "The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." (*Colten* v. *Kentucky* (1972) 407 U.S. 104, 110 [32 L.Ed.2d 584, 590, 92 S.Ct. 1953], [disorderly conduct statute].)

■ The "prohibition against excessive vagueness does not invalidate every statute which a reviewing court believes could have been drafted with greater precision. Many statutes will have some inherent vagueness, for '[i]n most English words and phrases there lurk uncertainties.' [Citation.] Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid. [Citations.] All the Due Process Clause requires is that the law give sufficient warning that men may *conduct themselves so as to avoid that which is forbidden." (*Rose* v.

*Locke* (1975) 423 U.S. 48, 49-50 [46 L.Ed.2d 185, 188, 96 S.Ct. 243], (fn. omitted) ["crime against nature"].)

We believe that Penal Code section 12031, subdivision (a) gives just such warning.

The judgment is affirmed.

Thompson, J., and Hanson, J., concurred.