**Robert MICHENFELDER,
Plaintiff–Appellant,**

**v.**

**George SUMNER; Lieutenant Koon; C/O Horn; C/O Leslie; Sgt Jenae Holmes; Sgt Stuffelbeam; James Parker, Defendants–Appellees.**

**No. 86–1549.**

United States Court of Appeals,
Ninth Circuit.

Argued Dec. 15, 1987.

Submitted Oct. 21, 1988.

Decided Oct. 26, 1988.

---

10. Of course, a named defendant may make such a showing at trial.

Robert Michenfelder, Carson City, Nev., for plaintiff-appellant.

David F. Sarnowski, Deputy Atty. Gen., Carson City, Nev., for defendants-appellees.

Before FLETCHER, WIGGINS and NOONAN, Circuit Judges.

FLETCHER, Circuit Judge:

Robert Michenfelder, a maximum security prisoner, appeals an adverse judgment in his § 1983 action against Nevada state prison officials for conducting strip searches and otherwise exposing unclothed male inmates to view by female guards in the course of their duties in violation of the

fourth and eighth amendments. The district court found the searches reasonable, given the prison's legitimate security concerns and female prison employees' rights to equal employment opportunities. It also found that the prison's taser gun policy did not violate the Eighth Amendment. We affirm.

## BACKGROUND

When this action commenced Michenfelder was an inmate in the Nevada State Prison's (NSP) Unit 7, the maximum security unit for the state's 40 most dangerous prisoners. Defendant Sumner was then warden of the NSP and is now Director of the Nevada Department of Prisons. Other named defendants are correctional officers and prison administrators at NSP.

Strip searches are conducted every time a Unit Seven inmate leaves or returns to the unit, as well as after movement under escort within the unit, such as for sick call, recreation, disciplinary hearings, and visits. The strip searches complained of here include visual body cavity searches, but not physical contact searches. They are conducted at the end of the tier's hallway, in front of a barred gate behind which the guards conducting the searches stand (in an area known as the "sally port"). The searches are visible to the tier's other prisoners whose cell doors open onto the corridor, and, through a small window, to guards controlling the cell doors from the "lock box" located in the main corridor outside the tier. The searches also can be observed indirectly by officers in the "control bubble", a room with video screens for monitoring activity on the tiers by means of video cameras located at either end of the hallways. Female officers are permitted to work in the control bubble, at the lock box, and any other position available to a correctional officer (including shower duty). They do not conduct strip searches except in severe emergencies.

Prison regulations allow officers at NSP to carry "taser" guns. The taser operates by firing a tiny dart, attached to the gun with wires, into the prisoner, and by administering a low amperage, high voltage electrical shock which temporarily incapacitates the prisoner. *See People v. Heffner*, 70 Cal.App.3d 643, 647, 139 Cal.Rptr. 45, 46 (1977). NSP officers have threatened and in some instances actually fired tasers to enforce compliance with the strip searches and have also used the tasers in other disciplinary situations in the prison.

## PROCEEDINGS BELOW

Michenfelder commenced this § 1983 action on July 5, 1984. The complaint seeks a declaratory judgment that the frequent searches, conducted where other inmates and female correctional officers could observe him naked and subject to threatened use of the taser, violated Michenfelder's constitutional rights. He simultaneously filed a separate motion for a preliminary injunction prohibiting prison officials from strip searching him in view of female officers and and other inmates, from conducting searches before and after transport to certain activities within Unit Seven when he would be under escort at all times, and from using the taser at any time.

The magistrate consolidated the hearing of the preliminary injunction motion with the trial of the action by minute order dated August 27, 1984. Over Michenfelder's objections the district court affirmed the consolidation by order filed September 19, 1984. The trial was held on October 3 and October 24, 1984. On March 29, 1985 the magistrate recommended denial of the injunction and grant of judgment for the defendants. She found that the location and frequency of the searches was a reasonable response to a legitimate security interest within the prison, and that using female correctional officers for tasks that offer occasional views of nude prisoners is a good faith attempt to comply with the officers' equal employment opportunities. The magistrate further found that use of tasers was a reasonable method of ensuring compliance with the strip search policy, and thus was not cruel and unusual punishment. *See Michenfelder v. Sumner*, 624 F.Supp. 457, 459–60 (D.Nev.1985). Over Michenfelder's timely objections, the district court accepted the magistrate's report

and recommendations in their entirety. *Id.* at 464. This appeal followed. We have jurisdiction under 28 U.S.C. § 1291.

## STANDARD OF REVIEW

We review the trial court's findings of fact for clear error. *United States v. McConney,* 728 F.2d 1195, 1200–01 (9th Cir.1984). We will affirm the trial court's determinations unless we are left with a definite and firm conviction that a mistake has been committed. *Pullman–Standard v. Swint,* 456 U.S. 273, 284–85 n. 14, 102 S.Ct. 1781, 1788 n. 14, 72 L.Ed.2d 66 (1982). Conclusions of law are reviewed de novo, *McConney,* 728 F.2d at 1201, as are most mixed questions of law and fact, especially those implicating constitutional rights. *Id.* at 1203.

## DISCUSSION

"[C]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). However, "[t]he limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987). Recently, the Supreme Court emphatically set forth the standard for reviewing alleged infringements of prisoners' constitutional rights. In *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 2260–61, 96 L.Ed.2d 64 (1987), the Court rejected a standard of heightened scrutiny in favor of the following rational relationship test: "when a prison regula-tion impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *See also O'Lone,* 107 S.Ct. at 2404. The Court provided four factors to guide reviewing courts in applying this test: 1) the existence of a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; 2) the existence of alternative means of exercising the right that remain open to prison inmates; 3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and 4) the absence of ready alternatives as evidence of the reasonableness of the regulation (the presence of obvious easy alternatives may evidence the opposite). *Turner* 107 S.Ct. at 2262.[1]

In applying the *Turner v. Safley* test we must accord great deference to prison officials' assessments of their interests: "Prison administration is ... a task that has been committed to the responsibility of [the legislative and executive branches], and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have, as we indicated in [*Procunier v.*] *Martinez* [416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974)], additional reason to accord deference to the appropriate prison authorities." 107 S.Ct. at 2259. The Court reasoned, "In our view, such a standard is necessary if 'prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.'" *Id.* at 2262 (quoting *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed. 2d 629 (1977)).

---

1. Not all four factors will be relevant to each case. For example, the second *Turner* factor—availability of other avenues for exercising the right infringed upon—is much more meaningful in the first amendment context than the fourth or eighth, where the right is to be free from a particular wrong.

Though all our prior decisions employing the *Turner O'Lone* analysis have involved infringements·of inmates' first amendment rights, *Reimers v. Oregon,* 846 F.2d 561 (9th Cir.1988) (free exercise); *McElyea v. Babbitt,* 833 F.2d 196, 197 (9th Cir.1987) (same); *Standing Deer v. Carlson,* 831 F.2d 1525, 1528–29 (9th Cir.1987) (same); *McCabe v. Arave,* 827 F.2d 634, 637–38 (9th Cir.1987) (free exercise and speech); *Allen v. Toombs,* 827 F.2d 563, 567–68 (9th Cir.1987) (free exercise), as were both *Turner v. Safley* and *O'Lone v. Estate of Shabazz,* we believe that *Turner v. Safley's* suggested factors can be instructive in the context of other prisoners' rights cases, and have considered them here where applicable.

## I. FREQUENCY AND MANNER OF CONDUCTING STRIP SEARCHES

■ Michenfelder contends that NSP's strip search policy, which calls for visual body cavity searches whenever an inmate leaves or returns to the unit, as well as when he travels under escort within the unit—including when leaving to or returning from sick call, recreation, disciplinary hearings, and visits—is constitutionally infirm. The district court deferred to the prison officials' judgment regarding the searches' necessity, finding Michenfelder failed to show the searches were an exaggerated or excessive means of providing needed security. *Michenfelder*, 624 F.Supp. at 462.

The fourth amendment guarantees "[t]he right of the people to be secure ... against unreasonable searches and seizures." This right extends to incarcerated prisoners; however, the reasonableness of a particular search is determined by reference to the prison context. In *Bell v. Wolfish*, 441 U.S. 520, 558, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979), the Supreme Court set forth a balancing test for determining a search's reasonableness:

> "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the *scope* of the particular intrusion, the *manner* in which it is conducted, the *justification* for initiating it, and the *place* in which it is conducted."

*Id.* at 559, 99 S.Ct. at 1884 (emphasis added). The Court obviously recognized that not all strip search procedures will be reasonable; some could be excessive, vindictive, harassing, or unrelated to any legitimate penological interest. Thus our task is to consider carefully the reasonableness of NSP's strip search policies in Unit Seven.

*Scope and manner.* The searches are conducted on convicted prisoners in NSP's most restrictive unit, and are visual only, involving no touching. *See Rickman v.*

*Avaniti*, 854 F.2d 327, 328 (9th Cir.1988); *contrast with Bonitz v. Fair*, 804 F.2d 164, 172–73 (1st Cir.1986) (contact body cavity searches of female inmates conducted by police officers, without medical personnel, in non-hygienic manner and in presence of male officers not reasonable). Visual body cavity searches conducted after contact visits as a means of preventing prisoners' possession of weapons and contraband, even absent probable cause, have been found reasonable by the Supreme Court. *Bell v. Wolfish*, 441 U.S. 520, 558–60, 99 S.Ct. 1861, 1884–85, 60 L.Ed.2d 447 (1979). While the Court has not yet ruled on the constitutionality of *routine* searches such as are conducted in Unit Seven, we and other circuit courts have found them reasonable. In *Rickman v. Avaniti*, 854 F.2d 327, we approved strip searches that were conducted every time prisoners in administrative segregation left their cells for any purpose. As here, Rickman's custody status was the most restrictive available. Elevated security precautions are justified for prisoners placed in maximum security settings usually because of a history of maladaptive behavior within prison. *See also Hay v. Waldron*, 834 F.2d 481, 486 (5th Cir.1987) (visual body cavity search each time an administrative segregation inmate enters or leaves his cell reasonable); *Goff v. Nix*, 803 F.2d 358, 364–65 (8th Cir.1986) (strip searches and visual body cavity searches every time an inmate leaves the maximum security unit reasonable), *cert. denied* —— U.S. ——, 108 S.Ct. 115, 98 L.Ed.2d 73 (1987); *Campbell v. Miller*, 787 F.2d 217, 228 (7th Cir.) (routine visual body cavity searches before and after library visits reasonable), *cert. denied* 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986); *Arruda v. Fair*, 710 F.2d 886 (1st Cir.1983) (upheld routine visual body cavity searches of maximum security inmates when leaving or returning from law library, infirmary, and visits).

The frequency of strip searches in Unit Seven appears, from this record, to be very high. Prisoners are searched both coming and leaving their cells, even when traveling only within the unit while under escort and in chains at all times. However, so long as

a prisoner is presented with the opportunity to obtain contraband or a weapon while outside of his cell, a visual strip search has a legitimate penological purpose. *Turner v. Safley*, 107 S.Ct. at 2261. Michenfelder, who bears the burden of showing NSP officials intentionally used exaggerated or excessive means to enforce security, *see Soto v. Dickey*, 744 F.2d 1260, 1271 (7th Cir.1984); *Bell v. Wolfish*, 441 U.S. at 561–62, 99 S.Ct. at 1885–86, has failed to demonstrate that the searches at issue here were conducted in the absence of such opportunities.

*Justification.* The fact that Unit 7 houses the state's most difficult prisoners gives rise to a legitimate governmental security interest in procedures that might be unreasonable elsewhere. In addition, testimony and physical evidence before the district court substantiated several incidents in which contraband and homemade weapons were confiscated from Unit Seven inmates. Though Shift Lieutenant Koon testified that no strip search in Unit Seven had produced a hidden weapon, he also testified that the policy was "the only thing that has prevented that from happening."

*Place.* Michenfelder argues that strip searches should be conducted within the privacy of prisoners' cells rather than out in the hallway, and says the practice's irrationality is highlighted by the fact that visual strip searches in other units—and sometimes within Unit Seven—are still conducted through closed cell doors. The district court was persuaded by the State's position that officers are placed at a "dangerous disadvantage" when required to conduct the search through the solid cell door or enter a cell to enforce compliance, and that alternative sites are unavailable outside the cells that were more private than the hallway. *Michenfelder*, 624 F.Supp. at 460.

Michenfelder's argument is not meritless. In *Rickman* the fact that visual strip searches are conducted in the inmate's cell was a factor in determining their reasonableness. 854 F.2d at 328–29. However, *Turner v. Safley's* fourth factor—the presence or absence of ready alternatives—must be considered here. It is unfortunate that Unit Seven's layout appears to present only two alternative locations—the hallway or the prisoner's cell. NSP guards testified that conducting searches through the food slot in the cell's solid door was problematic. While we encourage NSP to opt for less public searches when security considerations allow, we will not question its judgment that conditions in Unit Seven reasonably require searches outside the prisoners' cells in order to protect the safety of the officers conducting them. Furthermore, the third *Turner v. Safley* factor—impact on prison personnel and the allocation of prison resources generally, 107 S.Ct. at 2262—also bears consideration. The magistrate considered evidence that conducting searches in cells would require additional officers, as would transporting inmates to less public locations elsewhere in the prison. Remodeling the facility to prevent other inmates from observing the searches through their cell doors could also be costly.

In sum, evidence in the record supports the district court's finding that NSP's strip search policy was reasonably related to legitimate penological interests.

## II. INFRINGEMENT OF PRISONERS' PRIVACY RIGHTS

■ Michenfelder also alleges that the routine strip searches are unconstitutional because female correctional officers and visitors can observe their occurrence. In the same vein, he contests the prison's practice of sometimes employing female officers for shower duty.

We recognize that incarcerated prisoners retain a limited right to bodily privacy. Shielding one's unclothed figure from the view of strangers, particularly strangers of the opposite sex is impelled by elementary self-respect and personal dignity.[2] *Grummett v. Rushen*, 779 F.2d 491, 494 (9th

---

**2.** This case involves the asserted privacy interest of a prisoner from being viewed while nude by a person of the opposite sex.

Cir.1985); *see also Cumbey v. Meachum,* 684 F.2d 712, 714 (10th Cir.1982) ("Although the inmates' right to privacy must yield to the penal institution's need to maintain security, it does not vanish altogether."). Thus we analyze this claim, too, by using *Turner v. Safley's* rational relationship test to determine whether NSP's impingement on inmates' right to privacy by employing females is "reasonably related to legitimate penological interests." 107 S.Ct. at 2260–61. We recognize as legitimate both the interest in providing equal employment opportunities and the security interest in deploying available staff effectively. Our circuit's law respects an incarcerated prisoner's right to bodily privacy, but has found that assigned positions of female guards that require only infrequent and casual observation, or observation at distance, and that are reasonably related to prison needs are not so degrading as to warrant court interference. *Grummett v. Rushen,* 779 F.2d at 494–95. *See also Bagley v. Watson,* 579 F.Supp. 1099, 1103 (D.Or.1983); *Smith v. Chrans,* 629 F.Supp. 606 (C.D.Ill.1986). In *Grummett,* prisoners in San Quentin prison challenged the constitutionality of the prison's search and surveillance activities when performed by members of the opposite gender. There, female officers were assigned to positions from which their observations of nude male prisoners were infrequent and casual, or from a distance. The court found that, given the restricted duties of female officers, the prisoners' privacy rights were not unreasonably infringed by the prison's policies and practices.[3]

Therefore, the issue here, therefore, is whether NSP's female officers regularly or frequently observe unclothed inmates without a legitimate reason for doing so. As in *Grummett,* female officers at NSP are not routinely present for strip searches. The record fails to show that Officer Jenae Holmes's alleged presence at a search involving Michenfelder was anything but an isolated incident, nor could the witnesses testify with certainty that she was actually observing the search from her position at the lock box in the main corridor. The record does support the magistrate's finding that the control bubble's video monitors would provide at most an indistinct, limited view should female officers, contrary to prison policy, closely watch the searches rather than simply monitor all the screens for unusual activity. Evidence of female officers' role in shower duty likewise did not establish an inappropriate amount of contact with disrobed prisoners.

The third *Turner v. Safley* factor has special relevance here. Prohibiting female employees from working in the control bubble, or requiring them to be replaced by males for the duration of strip searches, would displace officers throughout the prison. The prison's current allocation of responsibilities among male and female employees already represents a reasonable attempt to accommodate prisoners' privacy concerns consistent with internal security needs and equal employment concerns. *See Grummett v. Rushen,* 779 F.2d at 496.

With regard to visitors' opportunities to view the searches on the video monitors, the evidence supports the magistrate's finding that opaque screens covering the windows of the control bubble prevent visitors and attorneys from discerning anything other than "some movement" on the screens.

## III. EIGHTH AMENDMENT CLAIM REGARDING USE OF A TASER GUN

▮ Michenfelder also contends that the prison's policy of allowing its guards to carry taser guns and to use them to enforce compliance with orders constitutes cruel and unusual punishment in violation of the eighth amendment. This is a question of first impression in our circuit, and, as best we can tell, for other circuits as well.

Michenfelder was threatened with a taser when he refused to submit to a strip

---

**3.** The State correctly points out that *Grummett* used a least intrusive means test that has since been rejected in *Turner v. Safley. See also Kent v. Johnson,* 821 F.2d 1220, 1230 (6th Cir.1987) (rejecting *Grummett's* least intrusive means test in wake of *Turner v. Safley* ). *Grummett's* outcome, however, would be the same under either test.

search outside his cell upon returning from recreation. Guards informed Michenfelder that the inmate taken inside immediately before him, upon insisting he be strip searched in his cell, was shot twice with the taser before complying. Michenfelder himself, however, was not actually shot with one. The district court found NSP's use of tasers constitutional. Presented with a slim record regarding the taser's adverse effects on humans, the court concluded, "It seems safe to assume that the [Nevada State Board of Prison Commissioners] received input from persons with experience and expertise before prescribing the Regulation."[4] *Michenfelder*, 624 F.Supp. at 463–64. It also found acceptable the threatened use in this particular instance, but erroneously assumed Michenfelder was threatened for refusing to *leave* his cell, rather than for requesting to be taken *to* his cell.

"Whatever rights one may lose at the prison gates, ... the full protections of the eighth amendment most certainly remain in force. The whole point of the amendment is to protect persons convicted of crimes." *Spain v. Procunier*, 600 F.2d 189, 193–94 (9th Cir.1979) (citation omitted). Punishments "repugnant to the Eighth Amendment [are those] incompatible with 'the evolving standards of decency that mark the progress of a maturing society,' or which 'involve the unnecessary and wanton infliction of pain.' " *Estelle v. Gamble*, 429 U.S. 97, 102–03, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (citations omitted). "Among 'unnecessary and wanton' inflictions of pain are those that are 'totally without penological justification.' " *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981) (citations omitted).

The Supreme Court has said that administering electric shocks to prisoners as punishment for misconduct was "unusual".

*Hutto v. Finney*, 437 U.S. 678, 682, 98 S.Ct. 2565, 2569, 57 L.Ed.2d 522 (1978). There, guards in an Arkansas prison used the "Tucker telephone", a hand-cranked device, to administer electrical shocks to various sensitive parts of an inmate's body. *Id.* From the record before us, NSP's use of tasers is distinguishable. The taser was used to enforce compliance with a search that had a reasonable security purpose, not as punishment. The legitimate intended result of a shooting is incapacitation of a dangerous person, not the infliction of pain.

In *Spain v. Procunier*, 600 F.2d 189, in which we found that limited use of a demonstrably dangerous and painful substance, tear gas, did not violate the eighth amendment when used to contain disturbances that threatened an equal or greater harm. *Id.* at 195. Implicit in the court's holding is the requirement that the instrumentality not be used for punishment and be used in furtherance of a legitimate prison interest only when absolutely necessary:

> [U]se of the substance in small amounts may be a necessary prison technique if a prisoner refuses after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required.... The infliction of pain and the danger of serious bodily harm may be necessary if there is a threat of an equal or greater harm to others ...

*Id.* at 195.

Nevada's Department of Prison Regulation 405 specifies that tasers are for controlling potentially dangerous situations, not for punishment: "When situations arise, such as an inmate who refuses to leave his cell, in which physical handling is inadequate and in which the use of batons would be inappropriate, the use of tasers or stun guns may be employed." NSP authorities believe the taser is the preferred

---

**4.** Such assumptions can never be made safely. *Cf. People v. Sullivan*, 116 A.D.2d 101, 500 N.Y. S.2d 644, 647 (1986) (In discussing police officers' alternatives for subduing/controlling dangerous persons, court noted "although the [taser] was introduced in 1971, there has been great concern about the impact on people with heart problems and its use has been outlawed in

this State."); *McCranie v. State*, 172 Ga.App. 188, 322 S.E.2d 360, 361 n. 1 (1984) ("Apparently, at the time of the incident at issue, taser guns were not considered by prison officials to constitute deadly force. They have, however, since been classified as such at the [Georgia State] prison."). Nonetheless Michenfelder's failure to carry his burden defeats him.

method for controlling prisoners because it is the "least confrontational" when compared to the use of physical restraint, billy clubs, mace, or stun guns.[5] By disabling the inmate, it prevents further violence.

Apparently, long-term effects of tasers are currently unknown. While the record regarding the risk of tasers is sketchy at best, Michenfelder has not cast doubt on the State's evidence of safe use and low risk of long term adverse effects. The evidence before the district court included the manufacturer's literature regarding testing on animals, which the court credited. Also, when contrasted to alternative methods for physically controlling inmates, some of which can have serious after effects, the taser compared favorably. At trial the only evidence of the taser's harmful effects was anecdotal. Michenfelder's witnesses said they felt only nausea, slight headaches, and "long-term anger." No one has been hospitalized at NSP as a result of a taser shot. Though Michenfelder argues that the court should have postponed trial on the merits so he could line up evidence of long term effects, and though such an endeavor might have produced useful results, Michenfelder's failure to pursue evidence diligently before and during trial precludes him from claiming prejudicial error. We do not lightly find abuses of discretion in decisions to limit discovery or to consolidate hearings. *See* Section IV.A., *infra.* Our affirmance of the district court is not, however, to be taken as holding that use of a device whose long-term effects are unknown would never violate the eighth amendment, nor that research could not uncover evidence of adverse long-term effects that would call into question the use of tasers. We simply find that Michenfelder has failed to meet his burden. *See infra* note 3.

A finding that the taser gun is not per se unconstitutional would not validate its unrestricted use. "[T]he appropriateness of the use must be determined by the facts and circumstances of the case." *Soto v. Dickey,* 744 F.2d at 1270. A legitimate

prison policy of carrying tasers to enforce discipline and security would not warrant their use when unnecessary or "for the sole purpose of punishment or the infliction of pain." *Id.* at 1270. Overall, the evidence does not establish "unwarranted use of this painful and dangerous [device] as a matter of practice." *See Spain v. Procunier,* 600 F.2d at 195. With regard to the incident involving Michenfelder, the legitimate penological purpose of strip searches—to discover hidden weapons and contraband—justifies using force necessary to induce compliance by difficult inmates. Employing the alternative suggested by Michenfelder—allowing prisoners who refused to be strip searched to be restrained, taken to their cells and searched there—could have a ripple effect throughout the prison, necessitating the use of additional prison staff if other prisoners joined in the passive resistance. Furthermore, the evidence in this case does not support finding an unconstitutional use of the taser gun against Michenfelder himself, who has complained only of its threatened use in the course of a strip search, nor does it support a finding that the taser's use violated state prison regulations. Evidence adduced at trial that the taser was fired at others, was not sufficient to establish that Michenfelder would, himself, be a target in unwarranted circumstances.

## IV. ALLEGED PROCEDURAL VIOLATIONS

Michenfelder's brief on appeal raises several procedural issues, including the magistrate's limitation of pretrial discovery of prison procedures and the warden's schedule, consolidation of the preliminary injunction hearing with the trial on the merits, failure to appoint lay counsel, inadequate access to library facilities, and the magistrate's failure to view personally the prison setup. The State, on its part, has moved to strike portions of Michenfelder's brief on appeal. We have carefully considered each contention in turn and find them meritless; only the consolidation issue and motion to strike warrant elaboration.

---

**5.** "Stun gun" as used by NSP witnesses refers to a device that shoots a "bean bag" projectile that will stun the target. In many places, however, "stun gun" is a synonym for taser.

## A. Consolidation of Hearing on Preliminary Injunction and Trial on the Merits

■ The magistrate consolidated the hearing on Michenfelder's preliminary injunction with the trial on the merits, as permitted by Fed.R.Civ.P. 65(a)(2). The district court approved the order.

Rule 65(a)(2) provides that "[b]efore or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application." Fed.R.Civ.P. 65(a)(2). Before a consolidation order may issue, the court must give the parties "clear and unambiguous notice [of the court's intent to consolidate the trial and the hearing] either before the hearing commences or at a time which will still afford the parties a full opportunity to present their respective cases." *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981) (quoting *Pughsley v. 3750 Lake Shore Drive Cooperative Bldg.*, 463 F.2d 1055, 1057 (7th Cir.1972)). What constitutes adequate notice depends upon the facts of the case. However, the district court's discretion to consolidate is very broad and will not be overturned on appeal "absent a showing of substantial prejudice in the sense that a party was not allowed to present material evidence." *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 101 (2d Cir.1985).

The district court's consolidation order issued five weeks before trial and seven weeks after filing of the complaint. We have on occasion upheld a district court's failure to give any notice whatsoever before finally determining the merits after only a preliminary injunction hearing, where the complaining party has failed to show how additional evidence could have altered the outcome. *Rosenthal v. Carr*, 614 F.2d 1219, 1220 (9th Cir.1980); *Brotherhood of Railway Carmen v. Pacific Fruit Express Co.*, 651 F.2d 651, 653 (9th Cir.1981). *See also Abraham Zion Corp. v. Lebow*, 761 F.2d at 101 (13 day notice sufficient for presentation of additional evidence following hearing). The district court here rightly rejected any suggestion that Wright and Miller's recommended 10 day notice would be adequate for incarcerated *in forma pauperis* plaintiffs to locate, obtain court appointment of, and consult with an expert witness. *Michenfelder*, 624 F.Supp. at 461 (citing 11 Wright & Miller, Federal Practice and Procedure § 2950 at 488 (1973)). Five weeks could also constitute inadequate notice in a complicated case. However, the sufficiency of notice must be evaluated in light of whether the plaintiff would have used the additional time productively. Not until June 18, 1985, seven months after the close of the trial, did Michenfelder indicate that he had contacted an expert in psychiatry willing to discuss the case with him.

Michenfelder argues that the consolidation prevented him from obtaining expert witnesses on the psychological harm caused by strip searches and the long term adverse effects of tasers. We must consider this latter allegation carefully. "Eighth Amendment judgments 'should neither be nor appear to be entirely the subjective views of judges,' but such 'judgments should be informed by objective factors to the maximum possible extent.'" *Soto v. Dickey*, 744 F.2d at 1269–70 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)). As discussed in Section III above, the record does not contain objective factors that would support a finding that the taser is unusually cruel or dangerous, when compared to alternative means of controlling prisoners that have demonstrable adverse effects (e.g., mace, billy clubs, stun guns, physical force). (See Magistrate's Recommendations, CR 43 at 18–20). Even documented adverse health impacts would have to be balanced against the threatened physical harm presented in situations where taser use is authorized. Michenfelder has not convinced us that giving him additional time to prepare for trial would have produced expert witnesses with material evidence that could have disproved the State's case. We thus conclude that Michenfelder has not shown substantial prejudice that would warrant reversal.

338

B. *Motion to Strike*

 The State filed a Motion to Strike portions of Michenfelder's brief on appeal; specifically, it moved to strike two diagrams purporting to depict the layout of Unit Seven and the location of the strip searches on an individual tier, and copies of correspondence between Michenfelder and various doctors.

The diagrams are simply a visual depiction of verbal testimony at trial describing Unit Seven's layout and where the searches were conducted. The State does not argue that the diagrams are inaccurate or misleading. In light of the latitude we prefer to allow pro se plaintiffs, we decline to strike the relevant diagrams. We grant the motion to strike the correspondence. It was never made a part of the district court record and does not appear to bear on the merits of this appeal.

CONCLUSION

The Supreme Court requires us, when ascertaining whether a regulation that impinges on inmates' constitutional rights is reasonably related to legitimate penological interests, to accord great deference to prison authorities' judgments regarding the necessity of the regulation. We accordingly affirm the district court's finding that the routine strip search procedures at the Nevada State Prison, even when conducted outside the inmates' cells by officers carrying taser guns and where female employees might occasionally view them, did not violate Michenfelder's fourth and eighth amendment rights. Consolidation of the preliminary injunction hearing with trial on the merits was not so prejudicial to the plaintiff as to constitute reversible error.

The judgment of the district court is AFFIRMED.