**Angela VALDEZ, Plaintiff,**

v.

**Teena FARMON, et al., Defendants.**

**No. CIV S–89–0939 GGH P.**

United States District Court,
E.D. California.

June 11, 1991.

Rick Seltzer and Margaret Johns, Seltzer & Cody, Oakland, Cal., for plaintiff.

Michael Lee, Atty. General's Office, Sacramento, Cal., for defendants.

**ORDER**

GREGORY G. HOLLOWS, United States Magistrate Judge.

Order re Partial Summary Judgment; order re Motion-in-Limine (use of regulations); order re jury instruction on qualified immunity.

## INTRODUCTION

This civil rights action arises under 42 U.S.C. § 1983. Plaintiff alleges that defendant used excessive force against her while she was incarcerated. Specifically, plaintiff alleges that defendant, Lt. Robert Ayers, used unnecessary and wanton force in connection with an ordered strip search. Plaintiff has raised substantive claims under the Fourth and Fourteenth Amendments, in addition to her Eighth Amendment claim. The Fourteenth Amendment claim includes an excessive force and right to privacy claim. The parties continue to dispute whether state regulations can be utilized in this constitutional tort case. Defendant has proffered jury instructions on the issue of qualified immunity. Because these difficult issues should be finally resolved prior to the instruction of the jury in this case, the court will detail its order concerning these issues.

*Procedural Background*

Defendant moved for summary judgment based on qualified immunity, and this court issued Findings and Recommendations concerning that motion.[1] The district court adopted the findings and recommendations and denied defendant's motion for summary judgment. Since that time, the parties have consented to the undersigned's further adjudication of this case for all purposes pursuant to 28 U.S.C. § 636(c). The facts utilized in resolution of the summary judgment motion are still by and large applicable here. However, those facts have been refined somewhat by the parties' subsequent joint submission of disputed and undisputed facts statement which was incorporated into the Pretrial Order. To make this order complete unto

---

1. Plaintiff initially named several defendants in this civil rights action. However, by the beginning of trial, the only defendant remaining in this action was Lt. Robert Ayers.

itself, the pertinent undisputed facts and disputed factual issues are set forth below.

*Undisputed Facts*

1. On July 18, 1988, plaintiff Angela Valdez was transferred from the Monterey County Jail to the Northern California Women's Facility (NCWF) at Stockton, California.

2. Ms. Valdez had been previously incarcerated at NCWF.

3. Ms. Valdez has two children.

4. Ms. Valdez was pregnant at the time that she was returned to custody.

5. Monterey County Deputies Leininger and Johnson transported Ms. Valdez to NCWF.

6. Leininger and Johnson placed Ms. Valdez in a holding cell in the Receiving & Release area upon the direction of [ex]defendant Lubken.

7. Lubken gave Ms. Valdez orders to strip for searching so that the jumpsuit that she was wearing could be returned to the Sheriff's deputies. Lubken ordered Ms. Valdez to go to a strip cell to perform these acts.

8. Ms. Valdez asked Lubken to check on her property which should have been transported from Monterey County to NCWF. Lubken would not agree to do so prior to concluding the Receiving and Release process.

9. Lubken left Ms. Valdez in the cell.

10. Lubken returned after a few minutes and again ordered Ms. Valdez to go to the strip cell and strip so that she could be searched.

11. Ms. Valdez refused to obey the orders to go to the strip cell and to submit to a search.

12. Lubken left Ms. Valdez in the holding tank and contacted Ortiz, her supervisor. Ortiz went to the holding cell and talked to Ms. Valdez concerning her refusal to obey the orders to go to the strip cell for searching and to exchange her county jail clothing for a prison muu muu.

13. Ortiz left and returned again. This time she gave Ms. Valdez the option of completing required written documents instead of immediately complying with the strip order.

14. Ortiz left Ms. Valdez and returned to her office. From there Ortiz called her supervisor, Lt. Ayers. Ortiz told Ayers that Ms. Valdez had been returned to custody as a parole violator and was refusing to comply with reception procedures, including a strip search. Ayers asked Ortiz what she had done to obtain compliance with her orders and Ortiz told him.

15. Ayers called his immediate superior, Program Administrator Brayer. Ayers told Brayer of the problem and asked for authorization to use the taser, if necessary.

16. Brayer called his supervisor Chief Deputy Warden Kuykendall, because he himself could not authorize use of the taser. Brayer recommended approval of Ayer's request to use the taser, if necessary. Kuykendall approved use of the taser.

17. Ayers contacted Sgt. Randazzo and asked him to meet him at the R & R area of the prison.

18. Ayers and Randazzo met at R & R.

19. Ayers went to the holding cell where Ms. Valdez was and gave her five minutes to comply with Sgt. Ortiz's orders.

20. Ayers then met with Ortiz, Lubken, and Randazzo in Ortiz's office.

21. Ayers talked to Ortiz, Randazzo, and Lubken about their individual responsibilities in case it was necessary to use the taser.

22. After the MTA arrived, Ayers, Ortiz, Randazzo, Lubken and Rasmussen left Ortiz's office and went to the holding tank where Ms. Valdez was. Then they all entered the holding tank.

23. Ayers ordered Ms. Valdez to comply with the orders previously given by Ortiz. Ortiz restated the orders.

24. As Ms. Valdez spoke, Ayers fired the taser without warning. The taser darts hit Ms. Valdez in the abdomen and left leg.

25. Ms. Valdez sank to her knees.

26. According to the MTA, her pulse and blood pressure were within normal

ranges and her eyes responded appropriately to light.

27. Ms. Valdez was taken to a strip cell where she was undressed and searched by Lubken and Ortiz.

28. Ms. Valdez was taken to Administrative Segregation by Randazzo and Lubken.

29. Ms. Valdez was examined the following day by Dr. Reschke.

30. On August 2, 1988, Ms. Valdez came to the infirmary complaining that she was passing blood clots and of heavy bleeding. Ms. Valdez was thought to have suffered an incomplete abortion and she was sent to San Joaquin General Hospital for a D & C. A D & C was performed by Dr. Wells.

31. Ms. Valdez returned to NCWF at 10:30 p.m. that night.

32. On July 18, 1988, all of the defendants were employees of the State of California Department of Corrections and assigned to NCWF.[2] All were acting in performance of their duties and under color of state law.

### Disputed Factual Issues

The disputed factual issues set the context for the rulings here. Plaintiff contends and defendant disputes that plaintiff was ordered to strip in front of male deputies and correctional personnel. Plaintiff asserts that prior to the taser firing, she communicated her willingness to go to the strip cell to remove her clothes. It is alleged that the order to strip with males present and the tasering were carried out in violation of pertinent state prison regulations.

### DISCUSSION

I. The Fourth Amendment and Fourteenth Amendment Claims are Subject to Summary Judgment Against Plaintiff

A. *Partial Summary Judgment Is Properly Entered At This Time*

The unusual procedural posture in which this court decides plaintiff's Fourth Amendment and Fourteenth Amendment claims merits consideration. Plaintiff clearly raised these claims in her pleadings. After hearing defendant's motion for summary judgment on qualified immunity grounds, this court intimated that plaintiff's only viable claims were those sounding in the Eighth Amendment. However, the court did not need to then rule on the exclusivity of the Eighth Amendment claim.

■ At pretrial conference, a discussion was held concerning the propriety of non-Eighth Amendment claims, and it was agreed that the Fourth Amendment and privacy claims of plaintiff were "merged" into the Eighth Amendment claim. Pretrial Order, page 6. The parties were given ten days to object to the Pretrial Order (page 16). Neither party objected. Technically, because the Pretrial Order became final, plaintiff may not bring any claim outside of the Eighth Amendment. However, the court finds that plaintiff has not expressly waived her Fourth Amendment and Fourteenth Amendment claims due to the complexity of the issues, the ambiguity of the term "merge," and the absence of a full hearing on the issues at the pretrial conference. Defendant, of course, does not dispute the deletion of non-Eighth Amendment claims.

Plaintiff briefed her Fourth Amendment and Fourteenth Amendment claims in her trial brief and submitted proposed jury instructions consistent with her position. Defendant raised qualified immunity in his proposed jury instructions. Both parties submitted motions-in-limine, and then argued their positions at length during a two-hour hearing on June 3, 1991, prior to the commencement of trial.

■ The court is presently faced with a situation which is very similar to a summary judgment hearing after a full airing of the issues. The court is further aided by the parties' joint stipulation of undisputed facts and disputed factual issues as well

---

**2.** See *supra,* note 1.

as the cogent arguments marshalled by each side at the June 3, 1991, hearing. There is no sensible reason why this court cannot summarily adjudicate the issues at this time. A court may grant summary judgment at the pretrial conference, *Southern California Retail Clerk's Union and Food Employees' Joint Pension Trust Fund v. Bjorklund*, 728 F.2d 1262, 1264 (9th Cir.1984); the court should be able to grant summary judgment after pretrial conference when the parties have appeared and argued the issues. In any event, if the court fails to give jury instructions on the Fourth Amendment and Fourteenth Amendment claims, the result is the same whether the court terms its ruling a "summary judgment" or a refusal to give jury instructions. Moreover, it is fairer for all concerned if a record is made of the court's analysis in the event a party wishes to challenge it on appeal.

Finally, there is no need to exhaustively detail the standards for summary judgment. The parties have set forth undisputed facts. Although critical factual issues remain in dispute, even if the court assumes facts in plaintiff's favor, the court may grant partial summary judgment to defendant because plaintiff may not recover under the Fourth and Fourteenth Amendments as a matter of law.

### B. *The Fourth Amendment Issue*

No party disputes the legal propriety of seeking recovery based on the above facts pursuant to the Eighth Amendment.[3] Plaintiff asserts that the issues can also be analyzed under the Fourth Amendment and the Fourteenth Amendment. Because the standards used to analyze Fourth Amendment and Fourteenth Amendment (privacy) rights are different from those standards used in the Eighth Amendment context, the resolution of these issues is important to the case. This section discusses the propriety of the Fourth Amendment analysis, and concludes that defendant is entitled to judgment on this issue as a matter of law.

Plaintiff contends that she can argue to the jury that an order to strip in front of males under the above circumstances would violate her Fourth Amendment rights. At the hearing where these issues were discussed, plaintiff intimated that she could argue that the taser was used to intimidate her into stripping in front of the males.

However, whatever the motivation of defendant in using the taser, the stipulated facts demonstrate that no improper strip search actually took place. Correctional officers never stripped plaintiff in front of males. She has conceded that the search which took place inside the strip cell after tasering was appropriate (i.e., no Fourth Amendment violation occurred because of activities in the strip cell itself). In essence, plaintiff contends that a threatened Fourth Amendment violation with only the potential for an improper search gives rise to a Fourth Amendment claim. Alternatively, plaintiff contends that regardless of whether she was asked to strip in front of males, the use of a taser to assist in any search under the above circumstances violates the Fourth Amendment.

At first blush, a viable Fourth Amendment claim seems possible. However, analysis of the appropriate case law indicates that plaintiff's claims should properly be analyzed under the Eighth Amendment.

In *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), the Supreme Court held that excessive force "arrest" cases were to be governed by the objective reasonableness standards of the Fourth Amendment. The Court reasoned that since a specific amendment applied to the plaintiff's claims, other more generalized constitutional protections would not apply. *Id.* at 393–395, 109 S.Ct. at 1870–1871. The Supreme Court did not decide whether the Fourth Amendment applied to incarcerated prisoners, but it expressly noted that "[a]fter conviction, the Eighth

---

**3.** The parties agree that plaintiff's status is that of an incarcerated prisoner. At the time this action arose, plaintiff was incarcerated in state prison on a parole violation. Since plaintiff was a convicted defendant continuing to serve her sentence "inside" in lieu of parole, her situation is different from that of a pretrial detainee.

Amendment 'serves as the primary source of substantive protection ... in cases ... where the deliberate use of force is challenged as excessive and unjustified.'" *Id.* at 395, n. 10, 109 S.Ct. at 1871, n. 10, citing *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986). *See also, Sinaloa Lake Owners Ass'n v. City of Simi Valley,* 882 F.2d 1398, 1408–1409, n. 10 (9th Cir.1989) (alleged constitutional violations encompassed by a specific amendment are governed by that amendment); M. Schwartz, J. Kirklin, *Section 1983 Litigation: Claims, Defenses, and Fees,* §§ 3.7–3.8 (2d ed. 1991) suggesting that *Graham* confirmed that prisoners are protected by the Eighth Amendment rather than the Fourth Amendment).

Few Ninth Circuit cases analyze what Fourth Amendment rights a prisoner retains in light of the Eighth Amendment. Prior to the holding in *Graham,* the Ninth Circuit discussed constitutional violations occurring when prison officials performed digital rectal cavity searches. *Vaughan v. Ricketts,* 859 F.2d 736 (9th Cir.1988). Finding that the law was clearly established that prisoners retained "some" Fourth Amendment rights, the court analyzed the propriety of the search itself under the Fourth Amendment, and the means by which the search was performed under the Eighth Amendment.[4]

In another pre-*Graham* case, the Ninth Circuit examined the propriety of its prisoner search policy under the Fourth Amendment but analyzed the means by which the searches were compelled (use of a taser) under the Eighth Amendment. *Michenfelder v. Sumner,* 860 F.2d 328 (9th Cir.1988). *See also, Hill v. Koon,* 732 F.Supp. 1076 (D.Nev.1990) (analyzing the propriety of the search itself and the means by which the search was conducted under separate amendments); *McRorie v. Shimoda,* 795 F.2d 780 (9th Cir.1986) (claim of excessive force used during a strip

search analyzed under the Eighth Amendment rather than the Fourth Amendment). However, the mode of analysis in these cases did not appear to be an issue in dispute; the analytical framework was simply assumed as correct by the courts. Nevertheless, this court finds that the pre-*Graham* approach of the Ninth Circuit is consistent with the Supreme Court's mandate to apply specific constitutional amendments to specific allegations of constitutional infringements.

Not only does an Eighth Amendment analysis of the means by which a prison search is conducted appear warranted by *Graham,* analysis of the type of injury involved in this case also weighs in favor of applying only the Eighth Amendment to claims of recovery here. In *Vaughan* and *Michenfelder,* an actual search took place. The plaintiff in each case suffered an alleged Fourth Amendment *injury* because a search was actually consummated. Therefore, the constitutional propriety of each search *per se* could be analyzed under the Fourth Amendment. Here, *no* improper search actually took place. The above cases were able to distinguish the propriety of the search in the first instance from the means by which the search was carried out. This court finds the *Michenfelder* case setting especially persuasive, where the threat to use a taser to enforce a search (plaintiff's intimidation argument here) was analyzed under the Eighth Amendment rather than the Fourth Amendment. *Michenfelder,* 860 F.2d at 334–336. All of plaintiff's allegations concerning compensable injury here are directed at the means by which the search was undertaken, not the propriety of the search itself.[5]

The court also reaches the conclusion that the Fourth Amendment is inapplicable to this case based on the improbability that presenting both Fourth Amendment and Eighth Amendment theories of recovery could ever be rationally presented to the

---

4. The *Vaughan* court also analyzed the prisoners' complaints under the Fourteenth Amendment. However, the Ninth Circuit subsequently recognized that *Graham* made such an analysis improper. *Sinaloa Lake Owner's Ass'n,* 882 F.2d at 1408–1409, n. 10.

5. Thus, if the alleged improper strip search had actually taken place, plaintiff could possibly have sought recovery under both the Fourth and Eighth Amendments.

jury. Plaintiff suggests that the use of a taser to compel a search could be explained to the jury under the *Graham* objective reasonableness test, and at the same time under the "obdurate" or "wanton" Eighth Amendment test. The court cannot conceive that such a dual standard for the identical "excessive force" conduct makes sense. Plaintiff's theory of recovery should be limited to the Eighth Amendment.

This is not to say, however, that the *evidence* of an attempted improper search plaintiff planned to introduce in connection with the Fourth Amendment is inappropriate to the Eighth Amendment context. If the jury were to find that plaintiff was ordered to strip in front of males under the circumstances set forth in the undisputed and disputed facts, plaintiff's refusal to do so could very well be a justifiable assertion of her Fourth Amendment rights. Force used to compel prisoners to comply with orders violative of those rights may well be found excessive. In other words, a prisoner can invoke a clearly existing constitutional right, and say "no" to prison officials who are unjustifiably about to infringe on that right, without fear that force can be used with impunity in any event to compel her to give up that clearly established right.

It was clearly established in 1988 that routine unclothed searches by members of the opposite sex from that of the prisoner/searchee, or unnecessary viewing of a prisoner's unclothed body by correctional officers of the opposite sex, violated a prisoner's right to privacy or right to be free from unreasonable search and seizures.

*See, Grummett v. Rushen,* 779 F.2d 491, 494–496 (9th Cir.1985); *Michenfelder,* 860 F.2d at 334, n. 3 (approving the result reached in *Grummett,* but not the precise analysis). However, casual observances of unclothed prisoners by correctional officers of the opposite sex, or body cavity searches in emergency conditions, do not necessarily violate a prisoner's constitutional rights. *Michenfelder,* 860 F.2d at 334.

The Department of Corrections regulations existing at the time of plaintiff's incident (*see* sources cited *infra,* Section II) were patterned after the existing law, and buttress the court's conclusion that plaintiff's right to privacy during searches was clearly established. No reasonable correctional officer would believe in 1988 that he or she would be able to observe a strip search or the naked body of a prisoner of the opposite sex without a justification existing for that search/viewing. An unjustifiable order to a female to strip in front of males cannot stand as justification for the use of force to carry out that order.

Although structuring the Fourth Amendment "right-to-say-no" within the Eighth Amendment right to be free from unjustified force is a problematic task, the court believes that the instructions it has fashioned appropriately accomplish that job.[6]

## C. *Fourteenth Amendment Privacy Issue*

■ Plaintiff also seeks recovery under a Fourteenth Amendment right to privacy theory. As referenced in the authority above, a prisoner retains a limited right to privacy while incarcerated. However, the

---

**6.** The jury can be instructed as follows:

In determining whether the defendant's actions constitute the unnecessary and wanton infliction of pain, you may consider the means by which the search was conducted or proposed to be conducted. Prison officials have a legitimate penalogical interest in conducting strip searches on inmates when they arrive at a particular state prison facility. However, such a search may become improper because of the manner in which it is conducted or proposed to be conducted.

Prison inmates retain a limited right to privacy under the Constitution. The Constitution recognizes that a strip search in the presence of members of the opposite sex can be humiliating and degrading. However, strip searches conducted by, or in the immediate presence of, members of the opposite sex do not violate the Constitution when emergency circumstances exist, or when the view of the search by members of the opposite sex is inadvertent, casual or from a distance.

Force used to implement an actual or proposed improper prison search, or unjustified violation of privacy, may be found to be unnecessary and wanton.

Excessive force utilized to implement a proper search may be unnecessary and wanton.

same analysis that defeated a claim of recovery under the Fourth Amendment also defeats a claim under the Fourteenth Amendment. Again, no actual privacy injury took place here—plaintiff was never viewed naked or stripped searched by members of the opposite sex. Serious threats or force used in an *attempt* to violate a prisoner's right to privacy is better analyzed under the excessive force standards of the Eighth Amendment. The alleged injury suffered by the plaintiff results from use of excessive force—not because her privacy was violated. No valid Fourteenth Amendment right-to-privacy claim can stand here.[7] As with evidence related to the Fourth Amendment claim, evidence related to an attempted privacy violation may be introduced under the Eighth Amendment claim, with appropriate jury instructions. *See, supra,* note 4.

D. *The Fourteenth Amendment Due Process Claim*

■ Plaintiff alternatively argues that the excessive force claim is compensable under the Fourteenth Amendment due process clause which precludes an unjustified deprivation of liberty. Although some of the Ninth Circuit cases cited above utilized a concurrent Fourteenth Amendment analysis in excessive force situations, the Supreme Court has held that such an analysis is at best redundant with that of the Eighth Amendment. *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). In *Whitley,* the Supreme Court analyzed a prisoner's claim under the Eighth Amendment when a plaintiff challenged prison officials' use of force by shooting him. *Id.* at 321–322, 106 S.Ct. at 1085–1086. However, the Supreme Court in *Whitley,* held that the Fourteenth Amendment analysis in lieu of, or in addition to, an Eighth Amendment analysis is improper in an excessive force case. In the prison security context, the Eighth Amendment "serves as the primary source of substantive protection to convicted prisoners" and "the Due Process Clause affords ... no greater protection than does the Cruel and Unusual Punishments Clause." *Id.* at 327, 106 S.Ct. at 1088. In other words, the Supreme Court essentially held that the Eighth Amendment and Fourteenth Amendment claims were redundant. That view has been universally followed by the circuit courts subsequent to *Whitley, see, e.g., Sinaloa Lake Owners Ass'n,* 882 F.2d at 1408–1409, n. 10; *Walker v. Norris,* 917 F.2d 1449, 1454 (6th Cir.1990); *Berry v. City of Muskogee, Okl.,* 900 F.2d 1489, 1494 (10th Cir.1990) (reviewing circuit court authority).

An instruction authorizing recovery under the Fourteenth Amendment due process clause would therefore be redundant and improper. The court will dismiss on summary judgment the Fourteenth Amendment due process claim.

II. Use of State Regulations in a Constitutional Tort Case

■ The various tugs and pulls of authority make it extremely difficult to state the correct use of state regulations in a § 1983 Eighth Amendment tort case. On the one hand, in Fourteenth Amendment cases, the court can "create" liberty interests protected by the Constitution if the state statutes or regulations are phrased in mandatory language. *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Clemente v. United States,* 766 F.2d 1358, 1364–1365 (9th Cir.1985); *Toussaint v. McCarthy,* 801 F.2d 1080, 1095 (9th Cir.1986). Since a claim under the Fourteenth Amendment due process clause is precluded in this case only because of its redundancy with the Eighth Amendment, plaintiff could validly argue that regulations which would otherwise create a Fourteenth Amendment protectable liberty interest would create a protectable interest of some type in an Eighth Amendment case.

---

7. This analysis does not entirely preclude a Fourteenth Amendment claim in the prison context. When there is an actual injury to a prison inmate, an injury which is not encompassed by a specific constitutional amendment, the Four-

teenth Amendment will provide recovery. *See, Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (prisoner has a liberty interest in the non-arbitrary administration of antipsychotic medication).

In *Hewitt*, the Supreme Court reviewed state regulations for the placement of prisoners in administrative segregation and found that the regulations created liberty interests. The Supreme Court characterized the regulations as follows: "It [the Commonwealth of Pennsylvania] has used language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed ... and that administrative segregation will not occur absent specified substantive predicates—viz., 'the need for control,' or 'the threat of a serious disturbance.' " *Hewitt*, 459 U.S. at 471–472, 103 S.Ct. at 871. *See also, Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (state regulations establish the constitutional parameters of a prisoner's right to be free from the arbitrary administration of anti-psychotic drugs).

The court has reviewed the regulations concerning unclothed body searches/viewing and the use of force and finds them to be of the same type as those in *Hewitt*. The regulations at issue here contain an identical style and substantive format. They are mandatorily phrased and contain nearly identical specified factual predicates. For example:

> No force shall be used by any employee except in the employee's defense ... or when a person refuses to cooperate in a change in location.

California Dept. of Corrections, Administrative Manual § 4802.

> Nonlethal weapons (tasers, batons and baton rounds) shall be used for control only. They shall not be used as a means of punishment, nor to control an inmate/parolee who is already restrained, controlled or immobilized....

Administrative Manual § 4805.

> A warning shall be given prior to aiming a weapon at any person acting in less than an *immediate* life-endangering manner. Warnings may consist of shouting, blowing a whistle or discharging a firearm in a safe direction....

Administrative Manual § 4803.

> An inmate is subject to an inspection of his or her person, either clothed or unclothed.... All such inspections shall be conducted in a professional manner which avoids embarrassment or indignity to the inmate. Whenever possible, unclothed body inspections of inmates shall be conducted outside the view of others.
>
> (1) Correctional employees, other than qualified medical staff, shall not conduct unclothed body inspections of inmates of the opposite sex except under emergency conditions with life or death consequences....

Administrative Manual § 3287(b).

On the other hand, courts interpreting "cruel and unusual punishment" in jail conditions cases have stated that it is improper to constitutionalize state standards or regulations. *Hoptowit v. Ray*, 682 F.2d 1237, 1248–1249 (9th Cir.1982). Because the cruel and unusual punishment clause is what is being interpreted in an excessive force Eighth Amendment case, one could validly question a different outcome. This court knows of no authority that holds that an Eighth Amendment constitutional interest is created by state regulations, the violation of which gives rise to a constitutional tort. Nevertheless, courts analyzing the Eighth Amendment have relied on state regulations as persuasive of "evolving norms of decency" which form the hallmark of an Eighth Amendment violation. *See Michenfelder*, 860 F.2d at 335 (relying on a Nevada state regulation in an excessive force taser case); *Spain v. Procunier*, 600 F.2d 189, 196 (9th Cir.1979) (court may take into account, but is not bound by, state prison regulations concerning the use of force [tear gas]).

Thus, the court is faced with the choice of "constitutionalizing" state prison regulations for use in the Eighth Amendment context akin to creating a liberty interest in a Fourteenth Amendment context, or in simply using them as evidence to determine what evolving standards of decency are in the Eighth Amendment context. The cases support both choices, however, the court believes that the latter choice is more correct. While the Constitution may be able to tolerate a state-by-state definition of

property and liberty interests that are subject to a due process analysis, the term "cruel and unusual punishment" cannot be subject to dispositive state-by-state definition. The Eighth Amendment is one of national concern, and should be applied uniformly. State regulations may be indicative of what the national standards should be, but they are not dispositive of the issue. Therefore, the regulations proffered by plaintiff will be received into evidence for whatever value testimony and argument may give to them, but they will not be constitutionalized.

The jury shall be instructed on how to use the state regulations accordingly.[8]

### III. Qualified Immunity in the Eighth Amendment Context Should not go to the Jury

 In light of the analyses above, the court revisits the qualified immunity issue. Defendant's motion for summary judgment on the qualified immunity issue was denied on the basis that there were material issues of fact which went to the third prong of the qualified immunity analysis as set forth in *Chalkboard, Inc. v. Brandt*, 902 F.2d 1375 (9th Cir.1989). The court reaffirms its ruling that the first two prongs of *Chalkboard* preclude qualified immunity being granted here as a matter of law. Because the court concludes that the standard that plaintiff has to meet in an Eighth Amendment case includes an element of willfulness (i.e., wantonness), there is no possibility that the jury could rule in plaintiff's favor, yet also rule that defendant is entitled to qualified immunity. In other words, once the court rules that the law regarding the situation in dispute was clearly established, and that reasonable correctional officers should have been aware of that law, there is nothing left in the qualified immunity context for the jury to decide that it has not already decided in arriving at a verdict in plaintiff's case. The issue is

discussed at length in the following paragraphs.

A defendant is entitled to a qualified immunity if:

1. the law allegedly violated was not clearly established (a legal issue);

2. assuming that the law was clearly established, a reasonable person in the same circumstances would not have known that the law was clearly established (a mixed legal and factual issue); or

3. assuming that the law was clearly established and should have been so recognized, a reasonable person would not have known that he was violating the law under the factual circumstances of the case (a factual issue).

*Chalkboard, Inc. v. Brandt*, 902 F.2d at 1380–81. *See, also, Romero v. Kitsap County*, 931 F.2d 624, 627–628 (9th Cir. 1991).

State regulations will not defeat a qualified immunity defense, unless those regulations are of the type that would create a liberty interest. *Davis v. Scherer*, 468 U.S. 183, 194, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984). *See also, Clemente v. United States*, 766 F.2d at 1364–1365. However, as analyzed above in the discussion concerning use of regulations in the Eighth Amendment context, the regulations at issue here are of the type that create liberty interests, and but for the preemptive interaction of the Eighth Amendment over the Fourteenth Amendment, would have established the dispositive law for this case. In ruling on the previous summary judgment motion, the court had no hesitation in utilizing the regulations as some evidence of what the clearly established law was in 1988. Similarly, the court had no hesitation in utilizing the regulations as an aid in determining whether reasonable correc-

---

8. The court will give the following instruction:
 When deciding whether defendant violated plaintiff's constitutional right to be free from cruel and unusual punishment, you may consider the state prison regulations that have been admitted into evidence. If you find defendant did not comply with the regulations, this does not mean that plaintiff's Eighth Amendment rights were violated *per se*. However, if you do find non-compliance, you may consider this when deciding whether defendant's actions were unnecessary and wanton.

tional officers should have known of the clearly established law.[9]

This brings the discussion to the third point of the qualified immunity analysis. Normally, this point would be of jury concern (*see, e.g., Floyd v. Laws,* 929 F.2d 1390 (9th Cir.1991) [Fourth Amendment qualified immunity question permitted to go to the jury]), but it is not in the Eighth Amendment context. It appears that in the Eighth Amendment context, the Ninth Circuit follows the majority of circuits in holding that qualified immunity is inappropriate to submit to the jury. *Albers v. Whitley,* 743 F.2d 1372 (9th Cir.1984), *rev'd on other grounds,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). In *Albers,* the Ninth Circuit specifically stated that "a finding of deliberate indifference [under the Eighth Amendment] is inconsistent with a finding of good faith or qualified immunity." *Albers,* 743 F.2d at 1376. In recognizing the overlap between an Eighth Amendment analysis and a qualified immunity analysis, the Ninth Circuit stated that no qualified immunity is available if an Eighth Amendment violation is found. *Id.*

The above conclusion was also the holding in *Bates v. Jean,* 745 F.2d 1146 (7th Cir.1984). In that case, the jury found that a defendant "knowingly and intentionally deprived plaintiff of liberty and subjected him to cruel and unusual punishment." The jury also found that the same defendant acted in good faith and was therefore entitled to qualified immunity. The circuit court held:

> However, we find totally implausible any suggestion that the two special verdicts could be made consistent by construing them to mean that, although Jean knew that he was violating the plaintiff's rights, a reasonable person would not have known that these actions were a violation.... Under the court's instructions, to have answered the first interrogatory in the affirmative, the jury would have had to find defendant Jean's actions "shocking," "callous," or "bru-

tal." Such a finding cannot be reconciled with the finding that a reasonable prison guard would not have known that these actions were unlawful.

*Id.* at 1152.

The jury will be instructed that in order to recover under the Eighth Amendment, plaintiff must show that defendant's conduct was obdurate or wanton. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers,* 475 U.S. at 319, 106 S.Ct. at 1084. If the jury so finds, it cannot find at the same time that a reasonable correctional officer would not have known that he was violating clearly established law under the circumstances of the case. The verdict would be inconsistent.

Therefore, the proffered jury instruction by defendant on qualified immunity for alleged Eighth Amendment violations will not be given.

---

9. At summary judgment concerning the first two factors of the immunity analysis, the court found that the law precluding unjustified use of a taser was clearly established at the time of the incident complained of herein (July, 1988), and that reasonable correctional officers would have known of this clearly established law.